Filed 2/26/13  In re Joseph H. CA3

**NOT <u>TO</u> BE <u>PUBLISHED</u>**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| In re JOSEPH H. et al., Persons Coming Under the Juvenile Court Law. | C070804 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | (Super. Ct. Nos. JD232103, JD232104, JD232105, JD232106) |
| Plaintiff and Respondent, | |
| v. | |
| DEANNA H. et al., | |
| Defendants and Appellants. | |

Deanna H., the mother of 18-year-old M.C., 13-year-old S.H., 11-year-old Anthony H. and eight-year-old Joseph H., appeals from an order of the Sacramento County Juvenile Court adjudging the children dependents of the court and removing them from parental custody.  Ronald H., the presumed father of S.H., Anthony and Joseph, appeals from the same order.

1

On appeal, the parents contend the evidence is not sufficient to support the jurisdictional finding or the removal order. We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The family has resided in Sacramento County since early 2011. They have prior Child Protective Services (CPS) history in Shasta County dating back to 2000, involving physical abuse and general neglect.

Both parents have a criminal history. Mother has a 1998 conviction of welfare fraud. (Welf. & Inst. Code, § 10980, subd. (c)(2).)[1] Father has numerous convictions including willful cruelty to a child (Pen. Code, § 273a, subd. (b)) in 1999 and corporal injury of a spouse or cohabitant (Pen. Code, § 273.5, subd. (a)) in 1999, 2000, and 2003.

*Originating Circumstances*

On November 8, 2011, Sacramento County CPS received a referral stating mother had become furious with then-16-year-old M.C. for using too much bread to make sandwiches. According to the confidential mandated reporter, mother used a closed fist to hit M.C. on her arms, face, and head. When M.C.'s boyfriend and S.H. tried to intervene, mother pushed the boyfriend; threw a cellular telephone at S.H.; slapped S.H.; and pulled S.H.'s hair while screaming in her face. Father was present but took no action to protect the children; instead, he told M.C. to " 'shut up.' "

Later that day, a social worker interviewed M.C. at her high school. She said mother had yelled at her for using too much bread and explained that mother blames her for the family's financial problems. Mother tried to punch M.C. in the face but the blow landed on her right arm. When M.C.'s boyfriend tried to intervene, mother pushed him and stated she would have hurt him, too, if he had been age 18.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

M.C. told the social worker her arm was sore and caused her pain when she moved it. M.C. explained physical abuse was common in her home; mother had battered her many times, leaving marks and bruises; and mother hit and slapped S.H., pulled S.H.'s hair, and threw her cell phone at S.H.'s head although the phone hit her in the stomach. M.C. and S.H. cried all night, planned to run away, and were afraid to return home.

M.C. reported CPS had interviewed her and her siblings on many occasions, but no disclosures had been made because mother had coached the children about what to say. M.C. and S.H. felt they "must speak up or else it will never stop and/or get worse." M.C. was especially fearful of returning home now that she had talked to the social worker.

M.C. reported mother abused Anthony and Joseph. The abuse was most severe when father was not home; when he was present, he would intervene on the boys' behalf.

In the past, mother had choked Anthony by holding him by the throat up against the wall and the stairs. Mother similarly had choked M.C. to the point where she could not breathe.

M.C. reported there had been domestic violence between mother and father "for years." Father had gone to prison because of the violence, but mother always allowed him back in the house. Following his release from prison, father most often was the victim of the couple's domestic violence. The previous weekend, mother had pushed father into a closet and had thrown a heavy candle at his knee. Afterwards, father complained of pain and accused mother of breaking his leg.

M.C. acknowledged she has been impacted by having witnessed domestic violence. Mother's verbal abuse was "even more damaging" than the physical violence. Mother constantly yelled at the children, the girls more so than the boys because father

defended his own children. Mother told M.C. she was "disgusting and [was] the reason for all of the family hardships."

M.C. told the social worker "mother lies and it is hard to know what to believe." For example, mother told everyone "she is dying and does not have long to live," because "she has Lupus, Multiple Sclerosis (MS) and cancer." However, "no one has seen proof of these ailments." The social worker was unable to verify mother's claim that she had "shot and injured a woman who was flirting with her boyfriend and spent several years in prison for the crime." A background check showed mother's claims regarding her past employment and professional credentials were falsified or exaggerated.

M.C. explained mother would punish her by withholding necessary items such as toilet paper and a bed of her own. The refusals of toilet paper would result in towels and clothing being soiled, which, in turn, would lead to further discipline.

The social worker interviewed S.H. at her middle school. She provided essentially the same information M.C. had related. S.H. further reported father, who is not her biological father, mistreats her; mother hits her a lot, too. S.H. confirmed mother abuses the boys. S.H. once saw mother choke Joseph up against a wall; when she did so, all the children cried.

S.H. confirmed domestic violence has been ongoing between the parents for years. Although mother makes father leave the home, she allows him to return. S.H. confirmed there is not enough toilet paper for the children to use.

S.H. said she did not want to return home and explained she was scared mother would hurt her because she had spoken with the social worker.

The mandated reporter explained M.C. had allowed him to listen to messages mother had left on M.C.'s cell phone. Each message involved mother yelling, cursing,

4

and threatening M.C.  In one message, mother threatened to take M.C. and S.H. to juvenile hall because she was " 'done with them.' "

The social worker went to the parents' residence and tried to interview each parent separately.  Mother insisted they be interviewed together.  During the interview father seldom spoke and, when he did, mother usually corrected him or spoke over him.  Mother denied "ever putting 'hands on' the children, but then stated that she 'may have grabbed [M.C.'s] arm and smacked [S.H.] on her bootie.' "

The social worker interviewed Joseph, the youngest child, in the home.  Although she requested privacy, father repeatedly went in and out of the room during the interview, overhearing the social worker's conversation with Joseph.  The social worker reported: "Joseph was obviously reluctant to speak . . . and refused to answer most questions, even the questions that were generated around rapport building and not eliciting information." Joseph initially denied having been subjected to corporal punishment but later admitted he had been spanked with a belt.

During the social worker's interview with Anthony, father again repeatedly went in and out of the room, disrupting the interview.  Anthony was "cautious" and made inconsistent statements; for example, he first claimed he had observed the originating incident but then claimed he was in his room where he did not see anything.  Anthony acknowledged mother had hit M.C. on the arm.  He denied that he and Joseph had been subjected to corporal punishment but declined to state whether the same was true for his sisters.

Anthony told the social worker he "does not like all of the constant yelling, crying and screaming."  Anthony said, " 'once in a blue moon' his parents will get into a physical altercation;" father "will usually leave, but come back the following day." Anthony said he "didn't always feel safe at home" but would not say why he felt that way.

5

On November 9, 2011, the social worker put the girls in a voluntary placement with nonrelative extended family members (NREFM's).

On November 21, 2011, mother contacted the social worker to report M.C. had forced S.H. to make allegations that mother had physically abused both girls.

The social worker reported that, during a Team Decision Making (TDM) meeting on November 25, 2011, mother was "histrionic," tearful, and unrealistic, and she had difficulty focusing. Mother blamed everything on M.C. and stated she did not want to participate in services or continue with voluntary placement. The girls "remained steadfast in their statements."

The social worker was concerned about mother's attempts to undermine the children's statements and their placement. She believed mother was "coaching the children and turning other family members against the children."

Three days after the TDM, S.H. contacted the social worker and stated she wanted to go home. S.H. did not recant any of her earlier statements to the social worker but said she was not at ease residing with the NREFM. The social worker did not oppose her return.

During an interview at school on November 30, 2011, S.H. told the social worker "mother 'talked to her' about the incident and tried to coach her as to what to say . . . and then made her promise to report back what was said." But S.H. "had already made up her mind to tell . . . the truth, despite her mother's attempts to coach her." S.H. reiterated "everything happened the way she and [M.C.] initially described and her mother was still the same and didn't take responsibility for anything."

After the holidays, M.C. told the social worker she never wants to return to mother's home.

In the report for the initial hearing, the social worker predicted "the parents will continue to be appropriate during the course of the case to avoid the removal of the children from their care." Based on this assessment, the worker recommended that the three younger children remain in the parents' home.

*Petition*

On January 18, 2012, the Sacramento County Department of Health and Human Services (the Department) filed petitions alleging the four children came within section 300. M.C.'s petition later was amended to add a related allegation against her father, who is not a party to this appeal.

In relevant part, the petitions alleged the children were at risk of suffering serious physical harm inflicted nonaccidentally by the parents (§ 300, subd. (a)) or as a result of their failure to protect the children in an adequate manner (§ 300, subd. (b)). Specifically, the petitions alleged the parents have a history of using inappropriate and excessive corporal punishment, including restraining the children by their throats; using open and closed hands to push, kick, and strike the children, often causing pain, marks, and bruises; and, on or about November 7, 2011, punching M.C. and S.H. in the arms, shoulders, and heads, pulling S.H.'s hair, restricting the children's movement, and screaming in their faces.

*Detention and Addendum Report*

At the detention hearing on January 23, 2012, the juvenile court detained M.C. and, at the Department's request, ordered the parents "not to discuss the allegations with any of the children."

The next day, the social worker filed an addendum report noting mother had been ordered "not to discuss any part of the proceedings," including the social worker's report, with the children. In violation of this order, "mother texted the [NREFM] that [mother] was going through the report with [S.H.], 'line by line' and asking her why she made the

statements that she did. [M]other was further admonishing [S.H.] regarding her statements and insisting that her statements were untrue."

The social worker noted "[t]he Court's order at the Detention hearing was not the first time . . . mother had been cautioned in regards to coaching the children and talking to them about the allegations. [The social worker] has advised . . . mother of this, at all stages of the case, beginning with the referral on November 8, 2011. From the onset of the investigation though the Detention Hearing, . . . mother has repeatedly stated[] that she did not coach her children and that she would not discuss the allegations with them, or attempt to change their statements."

Despite her assurances, mother was observed making inappropriate statements in the lobby of the courthouse in the presence of the children. "[M]other was loudly discussing the information in front of her children and challenging them on statements that they previously made to [the social worker]. [M]other admonished [S.H.] for her statements and ordered [S.H.] to read the document when she did not want to. [Father] advised [S.H.] that she would be grounded for an indeterminate amount of time based on her statements. During these exchanges, [the social worker] repeatedly asked . . . mother to cease and desist in her behavior and implored . . . mother to allow the children to go to the Court Play Room so that they might be free to relax and not have to hear . . . mother's loudly expressed complaints. [Mother] refused to agree, as did . . . father."

The social worker interviewed all four children before and after the detention hearing. The boys indicated "they heard all of . . . mother's inappropriate statements and had been both stressed and embarrassed by them." S.H. reported mother "had coached her and her brothers the night before the Detention Hearing and advised them that it 'would be better if they said nothing.' [S.H.] reiterated . . . she had been threatened with being forced to read the report line by line and that she was grounded based on her statements."

8

After reviewing the allegations regarding "the parents' method of discipline, which includes choking their children," the social worker concluded the children were at risk of serious harm. She withdrew the Department's original recommendation that the three youngest children remain in the parents' care.

On January 25, 2012, the juvenile court ordered all four children detained. The court ordered that "father and mother shall not discuss the case with the children and all contact with the children shall be supervised."

***Jurisdiction and Disposition***

The social worker's report for the February 29, 2012 jurisdictional and dispositional hearing includes a February 22, 2012 mental health assessment by senior counselor Tricia Watters. Watters stated mother's behavior "made it incredibly difficult to discern the truth from made up stories. There are several inconsistencies which suggest [mother] is not credible." Watters found it "difficult to assess the safety of the children should they be returned to the home due to coaching, dishonesty, and poor boundaries." Watters expressed concern that mother's "dishonesty could present a safety risk to her children." Watters also expressed "a high level of concern regarding how [mother's] behavior impacts the emotional well[-]being of her children."

Watters stated mother "sees herself as an excellent mother despite the allegations of physical abuse" and concluded mother's "desire to present herself favorably appears to impair insight and judgment." Watters recommended mother undergo a psychological evaluation to rule out a personality disorder.

Mother submitted a lengthy handwritten letter disputing the petitions' allegations. But she conceded father had physically abused S.H. in the past.

In a lengthy interview with the social worker, mother made statements inconsistent with her prior statements to Department staff. In addition, mother contacted the social

worker "via telephone on many occasions in order to leave lengthy messages . . . to prove she is not responsible for the allegations before the Court and to defend [against] reports that she was still contacting the children unsupervised via text messaging and/or in person contact."

The social worker believed mother's interactions with her "cross[ed] the boundaries of [the former's] role as the professional social worker." Specifically, mother had called the social worker " 'hon,' " and had stated she believed the worker was "very beautiful." Mother's manifestation of a "stronger emotional connection to [the social worker] than was warranted" led the worker to "question if this is . . . mother's way of manipulating the outcome of the investigation."

Mother told the social worker there had been no incidents of domestic violence in the home since 2006. She acknowledged they "still have periods where the verbal language escalates to a place of abuse." Mother initially claimed the children were unaffected by the parents' verbal exchanges because they would go to other rooms. When asked whether relocating was the children's means of coping with the fighting, rather than an indication they were unaffected, mother responded, " 'You're right. I know this affects them a lot. I was naïve to think they were just in their rooms. They listened to see what's going on and who's gonna get hurt.' "

Regarding disposition, the social worker opined "there is no way at this time to keep the children safe unless they are continued in out of home placement." She identified several concerns: (1) "the obvious deception and the lengths . . . mother will go to in order to create a story that benefits her and makes her look as if she has a safe and healthy home for the children"; (2) "mother has provided countless discrepancies to the Department"; (3) "she has been deceitful with both the Department and the Court by breaking contact orders and has communicated through text message as well as in-person to the children"; and (4) "mother's coaching of the children was a huge source of conflict

10

. . . and she continues to prove it would be difficult to verify what is truly transpiring in the home."

The social worker also expressed concern regarding the parents' verbal abuse toward each other and the children. "[F]ather himself reported he believes . . . mother's communication with the children is emotionally unhealthy and abusive at times."

Finally, the social worker was concerned about father's "hands-off approach to parenting."

At the jurisdictional and dispositional hearing, M.C. testified, "I don't think my mom has ever hit us where there is bruises or marks." On cross-examination, M.C. denied having made a prior statement about a brother being choked up against a wall. However, M.C. did not address her statement to the social worker that mother had battered her many times resulting in marks and bruises.

At the conclusion of the jurisdictional and dispositional hearing, counsel for Joseph and Anthony agreed with the Department's recommendation for out-of-home placement. Counsel for S.H. also agreed with the recommendation. Counsel for M.C. advised the court she wanted to return home.

The juvenile court sustained allegations under section 300, subdivisions (a) and (b), as amended; adjudged the children dependents of the court; removed them from parental custody; ordered reunification services for the parents; and directed mother to participate in a psychological evaluation to determine whether she has a personality disorder.

## DISCUSSION

### I. Sufficiency of Evidence to Support Jurisdiction

The parents contend the jurisdictional findings are not supported by substantial evidence. Specifically, mother claims (1) "the children had not suffered serious physical

11

harm nor was there a substantial risk that they would suffer serious physical harm"; (2) "the parents had stopped using corporal punishment, and no further incidents were reported"; and (3) mother "was doing quite well in her services and had demonstrated that she was learning appropriate discipline techniques." Father argues there was (1) no current risk of physical harm, and (2) no evidence prior acts resulted in serious physical harm. We are not persuaded.

"In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding. [Citation.] When the [juvenile] court makes findings by the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard of review on appeal. [Citation.] The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order." (*In re Cole C*. (2009) 174 Cal.App.4th 900, 915-916.)

Section 300 authorizes the juvenile court to adjudge a child a dependent of the court under certain specified circumstances. (§ 300, subds. (a)-(j).) A reviewing court may affirm a jurisdictional ruling if the evidence supports any of the counts concerning the children. (*In re Jonathan B*. (1992) 5 Cal.App.4th 873, 875.) Thus, dependency jurisdiction is appropriate where substantial evidence supports at least one jurisdictional finding, even if there are other findings that are not supported by substantial evidence. (*In re Ashley B*. (2011) 202 Cal.App.4th 968, 979.) Because, as we next explain, there was sufficient evidence of substantial risk that the children would suffer serious physical

harm, we have no occasion to consider whether each child already had suffered such harm. (*Ibid*.)

Both parents claim the evidence was insufficient to support the section 300, subdivision (a) allegation that the children were at risk of suffering serious physical harm inflicted nonaccidentally by the parents. "For jurisdictional purposes, it is irrelevant which parent created those circumstances." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.) This is because "[t]he purpose of section 300 is 'to identify those children over whom the juvenile court may exercise its jurisdiction and adjudge dependents.' " (*In re A.O.* (2010) 185 Cal.App.4th 103, 110.) Because, as we explain, there was sufficient evidence of risk of infliction of harm by mother, we have no occasion to consider whether there also was evidence of risk of infliction of harm by father. (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492; *In re A.O.*, *supra*, 185 Cal.App.4th at p. 110.)

A child is described by section 300, subdivision (a) if "the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent . . . . For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, *a history of repeated inflictions of injuries on the child or the child's siblings*, or a combination of these and other actions by the parent . . . which indicate the child is at risk of serious physical harm." (Italics added.) Under the highlighted passage, evidence of repeated inflictions upon M.C. supports a finding of risk as to each child.

Because the statute allows a finding of substantial risk of serious future harm to be based upon a history of repeated inflictions of injuries, it is not necessary that any of the children suffered serious physical harm during the November 7, 2011 incident. The fact that no bruises were observed by the social worker, a responding police officer, or any of the children following that incident does not mean the evidence was insufficient.

13

Rather, under section 300, subdivision (a), the juvenile court "may find there is a substantial risk of serious future injury based on . . . a history of repeated inflictions of injuries on the child." In her November 8, 2011 interview with the social worker, M.C. stated, "physical abuse is common in the house and she has been battered many times in the past by her mother; resulting in marks and bruises." Mother's history of repeatedly inflicting marks and bruises upon M.C. supports a finding of substantial risk of future injury.

Father disagrees, citing *In re David H*. (2008) 165 Cal.App.4th 1626 (*David H*.). *David H*. held "that, in the absence of unusual circumstances not present here (such as a substantial lapse of time between the incident and the filing of a petition or the date of a jurisdictional hearing), an allegation that a child *has suffered* serious physical harm inflicted nonaccidentally by a parent . . . is sufficient to establish jurisdiction under section 300, subdivision (a)." (*Id*. at p. 1644.)

Father claims the "unusual circumstances" *David H*. alluded to in dictum are present here because there was a "substantial lapse of time" between the "many" "past" "marks and bruises" and the jurisdictional hearing. The language of M.C.'s statement does not support father's claim. M.C. prefaced her remarks about marks and bruises by noting "physical abuse is common in the house." She never indicated any substantial lapse of time between the past marks or bruises and the still-common physical abuse.

The parents nevertheless claim they are within the *David H*. exception because there was a substantial lapse of time between *M.C.'s statement to the social worker* and the jurisdictional hearing. The Department acknowledged no new physical incidents occurred in that interval. Mother had begun a parenting class, anger management classes, and group counseling.

But the commencement of voluntary services during dependency proceedings can hardly be termed an "unusual circumstance." (*David H*., *supra*, 165 Cal.App.4th at

14

p. 1644.) And nothing in *David H.* suggests the passage of a mere five months renders the parent's earlier infliction of serious physical harm insufficient to establish jurisdiction under section 300, subdivision (a). (*David H.*, *supra*, at p. 1644.)

Mother appears to contend the batterings M.C. had described to the social worker, which resulted in marks and bruises, never occurred. Mother claims "[t]here was simply no evidence that the parents had ever left any sort of mark or bruise on any of the children." The parents rely on M.C.'s testimony at the jurisdictional hearing that she did not "think [her] mom has ever hit us where there is bruises or marks." The parents' reliance is misplaced because the juvenile court could have found M.C.'s statement to the social worker more credible than her testimony at the hearing.

As noted, the reviewing court does "not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding." (*In re Cole C., supra*, 174 Cal.App.4th at p. 916.) In this case, M.C.'s statement to the social worker is sufficient to support the jurisdictional finding. The fact that M.C.'s trial testimony could have supported a contrary finding does not warrant reversal of the order.

Because substantial evidence supported the jurisdictional finding under section 300, subdivision (a), it is not necessary to consider whether there was sufficient evidence to support a jurisdictional finding under section 300, subdivision (b). (*In re Ashley B.*, *supra*, 202 Cal.App.4th at p. 979.)

## II. Sufficiency of Evidence to Support Removal Orders

The parents contend the removal orders are not supported by substantial evidence. Specifically, they claim (1) there was insufficient evidence of substantial danger to the

children if they returned home, and (2) there were other reasonable means by which the children could be protected. Neither point has merit.

Section 361 provides in relevant part that a dependent child may not be taken from the parent's physical custody unless the juvenile court finds clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if he or she were returned home, and "there are no reasonable means by which the [child's] physical health can be protected without removing" the child from the parent's physical custody. (§ 361, subd. (c)(1).) The fact a child has been adjudicated a dependent child of the court pursuant to section 300, subdivision (e), is prima facie evidence the child cannot be safely left in the parent's physical custody. (§ 361, subd. (c)(1); see *In re Cole C.*, *supra*, 174 Cal.App.4th at p. 917.)

Although the juvenile court must employ the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard of review on appeal. The parents have the burden of showing there is no evidence of a sufficiently substantial nature to support the order. (*In re Cole C.*, *supra*, 174 Cal.App.4th at pp. 915-916.) This they have not done.

In part I, *ante*, we concluded there was sufficient evidence of substantial risk that the children would suffer serious physical harm based on mother's history of repeated inflictions of injuries on M.C. We also rejected the claim that the passage of a mere five months, from November 2011 to March 2012, without further abuse while participating in voluntary services renders the evidence of risk insubstantial. The parents offer no reason to reconsider these determinations and we decline to do so.

Instead, the parents point to evidence from which the juvenile court *could have drawn* a contrary conclusion. Thus, M.C. testified at the dispositional hearing: "Well, over almost a six-month period, I doubted my mom and my relationship for a while. But

16

with the visits, it helps and makes me miss my family even more, because I do see a change in my mom and in my dad. And I do believe we are safe to go home, and I do believe that my siblings are safe to stay there." The social worker testified father did not pose an independent risk of physical abuse because he has adopted a "hands-off" approach to parenting. The parents' arguments are unavailing under our standard of review, which requires us to affirm the order if supported by substantial evidence even if there is other evidence that would support a contrary finding. (*In re Cole C.*, *supra*, 174 Cal.App.4th at pp. 915-916.)

Father relies on the fact the Department allowed the children to remain in the parents' home for two months after it became aware of the parents' history of excessive corporal punishment. The juvenile court acknowledged this had occurred, but it explained why that fact was not controlling: "The social worker at the time attempted very clearly to not only give the parents the benefit of the doubt, but to believe that the parents would be willing and able to address the family issues with the children in the home with the provision of services, but the mother has shown through her conduct that she is not willing or able to comply with the directives of the Department [and] with the orders of the Court in regard to addressing the detriment that occurs to children with physical abuse that goes on in the home, and the detriment to the children that occurs with the level of verbal and emotional violence that appears to be very much a part of the family household."

Father claims the juvenile court's removal order was "particularly unwarranted" with regard to the boys, because there was "no substantial evidence either child had ever been subjected to any form of excessive corporal punishment." Father's argument disregards the record and has no merit.

M.C. told the social worker that mother abused Anthony and Joseph. For example, mother choked Anthony by holding him by the throat up against a wall and

17

against some stairs.  The abuse was most severe when father was not home; when he was present, he would intervene on the boys' behalf.

S.H. confirmed to the social worker that mother abused the boys.  S.H. had seen mother choke Joseph up against a wall.

Earlier, in May 2006, mother had made a CPS referral in which she reported father "entered the home, choked her [four-year-old] son and called him a 'sissy bitch.' . . . [Four-year-old] Anthony disclosed details consistent with [mother's] statement that he was choked and kicked by [father]."

In his reply brief, father acknowledges the existence of this "historical evidence," but he claims the record established a "significant change in both parents' behavior" since those incidents occurred.  Father's reliance on the evidence of "significant change" is misplaced.  The juvenile court found, based on substantial evidence, that mother was "not willing or able to comply with the directives of the Department [and] with the orders of the Court in regard to addressing the detriment that occurs to children."  The evidence did not compel a finding that, notwithstanding mother's inability or unwillingness to comply with directives and court orders, the short-term "significant change" in mother's behavior would endure or be permanent.  Rather, the court properly found "there is nothing in front of [it] to believe that anything would be different than it was at the time of the initial hearing in this case.  That is, children in a home where they are pressured regarding statements they have made regarding . . . what's going on in the family household rather than an honest, forthright attempt at solving the problems that exist within the family household."

Father claims this case is similar to *In re Jasmine G.* (2000) 82 Cal.App.4th 282 (*Jasmine G.*), in which the appellate court found "the trial court had no substantial evidence on which to predicate a finding of substantial danger to the daughter."  (*Id.* at

p. 285.)  But as we explained in part I, *ante*, the present record contains ample evidence to support such a finding with regard to each of the children.

For example, in *Jasmine G.* the parents' therapist stated the daughter would be in no " 'danger' " if she were returned to one of the parents; the therapist noted that both parents had expressed remorse and were motivated to change their former forms of discipline.  (*Jasmine G.*, *supra*, 82 Cal.App.4th at p. 286.)  Here, in contrast, the counselor who performed a mental health assessment on mother expressed "a high level of concern regarding how [mother's] behavior impacts the emotional well[-]being of her children."  The counselor found it was "difficult to assess the safety of the children should they be returned home due to coaching, dishonesty, and poor boundaries."  She also noted there was "discrepant information and concern that [mother's] dishonesty could present a safety risk to her children."  The counselor recommended that mother undergo a psychological examination to rule out a personality disorder.  Father's reliance on *Jasmine G.* is misplaced.

This leaves the parents' contention there were alternative means, short of removal, by which the children could have been protected.  Mother claims a "very reasonable alternative was to allow the children to remain home with their parents while the family participated in services."  Father claims, instead of ordering removal, the juvenile court "should have implemented a family maintenance plan, centered on conjoint counseling, to address the family's flawed dynamics."

These contentions have no merit.  Both parents were resistant to the social worker's instructions, defied court orders, and created disturbances during a court proceeding as well as during interviews by the social worker.  This resistance and defiance made home supervision unfeasible.

The social worker's report identified several of these concerns:  (1) "the obvious deception and the lengths . . . mother will go in order to create a story that benefits her

19

and makes her look as if she has a safe and healthy home for the children"; (2) "mother has provided countless discrepancies to the Department"; (3) "she has been deceitful with both the Department and the Court by breaking contact orders and has communicated through text message as well as in-person to the children"; and (4) "mother's coaching of the children was a huge source of conflict . . . and she continues to prove it would be difficult to verify what is truly transpiring in the home."

Father demonstrated an unwillingness or inability to comply with the social worker's requests for privacy during her interviews of Joseph and Anthony. After being taught during domestic violence classes to walk away during a heated moment, father misapplied this technique to his universe of parenting efforts. Thus, he "has basically assumed a hands-off approach to parenting and to his involvement in the family chaos." Father needed to "learn when and how to appropriately stand up and protect the children when the mother has failed to do so."

At the dispositional hearing, the juvenile court properly found "there are no reasonable measures that could be put into place to allow any of the children to return home." The court expressed a "significant level of concern that [mother] continues to dismiss her behavior, to justify it, and to insist that there is nothing wrong with that." The court noted "no one has been able to articulate what has changed in the relationship either between [M.C.] [and mother] or [mother] and any of the other children in regards to alternative forms of appropriate discipline."

At the conclusion of the dispositional hearing, father spontaneously stated, "Oh, my God. [¶] . . . [¶] I never had a chance to talk in this whole thing." The juvenile court reminded father that it had just conducted a contested proceeding and that he had been given an opportunity to testify if he so desired. The court added that father's outburst was "exactly what [it was] talking about in terms of the interactions of the dynamics in this family." The court ordered physical custody removed from the parents and noted

20

that father "has just left the courtroom. Obviously, less than happy." Shortly thereafter, father re-entered the courtroom. For a reason not disclosed on the record, a bailiff escorted him back outside. In a remarkable display of chutzpah, mother chided the court for removing father "in front of the kids." Mother persisted in talking over the court even after the child, M.C., asked her to stop.

On this record, the juvenile court properly found that the parents were not amenable to following directions or court orders, thus rendering in-home supervision unfeasible. The fact other evidence in the record would have supported a different finding or outcome does not warrant reversal of the judgment. (*In re Cole C.*, *supra*, 174 Cal.App.4th at pp. 915-916.)

## DISPOSITION

The order of the juvenile court adjudging the children dependents of the court and removing them from parental custody is affirmed.


                                                                BUTZ                 , Acting P. J.

We concur:


        MURRAY             , J.


        DUARTE            , J.