Filed 5/16/13  In re D.D. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Butte)

----

| | |
|---|---|
| In re D.D., a Person Coming Under the Juvenile Court Law. | C069766 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JILL D.,<br><br>Defendant and Appellant. | (Super. Ct. No. J-35787) |

Jill D., mother of the now 10-year-old minor D.D., appeals from an order of the Butte County Juvenile Court adjudging the minor a dependent of the court and removing him from mother's custody.  Mother contends the evidence is not sufficient to support either the jurisdictional finding or the removal order.  We shall affirm.

1

**FACTUAL BACKGROUND**

*Originating Circumstances*

In the Spring of 2011, the Butte County Department of Employment and Social Services (the Department) received three referrals regarding D.D.[1]  The first referral was received on March 20, 2011.  The reporting party alleged that mother took D.D. to the "crisis unit" after consulting with the child's pediatrician and claimed D.D. had bipolar disorder.  The crisis unit did not agree with mother's diagnosis and D.D. expressed fear of mother when she was not in the room.  The referral was deemed "unfounded" for physical abuse and "inconclusive" for general neglect.

Two days later, the Department received a second referral, also alleging general neglect.  The reporting party said mother "refused to accept the diagnosis that there was nothing wrong with her child," was "medication and diagnosis seeking," and gave the minor medication "even though clinicians and psychiatrists saw no evidence of reported behaviors."  The reporting party further indicated mother had "slapped" D.D., and took D.D. to the emergency room "three or four times for heart palpitations."  Before this referral was resolved, the Department received a third referral.

On April 1, 2011, the Department received a report that mother may suffer from Munchausen by Proxy Syndrome, which put D.D. at risk.  According to reports, mother claimed D.D. would become violent or manic and would "rage," putting himself and mother in jeopardy.  No one other than mother, however, had witnessed these episodes.

The night before the Department received the April 1 referral, D.D. was taken to "Behavioral Health" to protect him from mother's behavior.  D.D. was then admitted to the hospital by his physician, Dr. Amy Dolinar, so that she could wean him off all his medications under medical supervision.  While he was hospitalized, Dr. Dolinar assessed

---

[1]  A referral for general neglect was also made to Santa Barbara County Children's Services in March 2009.  That referral was deemed unfounded.

D.D. as well as mother for Munchausen by Proxy Syndrome. Dr. Dolinar then wrote a letter to the Department expressing her concern for D.D.'s safety if left in mother's care: "I fear the possibility that she will hurt him or herself in order to 'prove' that he is violent." A petition alleging D.D. came within Welfare and Institutions Code section 300[2] was then filed.

### The Petition and Detention

In its petition, the Department alleged mother failed to protect the minor. (§ 300, subd. (b).) To support that allegation, the Department further alleged that the minor said he "wished that he had a different mom," and he wished he could be "[section 5150'd]." The Department alleged the minor admitted to hitting mother and "calling her bad words," that mother ignored specific instructions not to visit the minor in the hospital, and mother told the minor "he was being taken away from her because he was a bad boy at home."

To support the allegation that mother failed to protect the minor, the Department alleged the following:

"b-2. Based on [mother's] reports of symptoms and behaviors the child has been diagnosed with Bipolar Disorder, Attention Deficit Hyperactivity Disorder, Oppositional De[f]ian[t] Disorder, and non-specific cardiac arrhythmia by a series of physicians and prescribed at one time or another[:] Seroquel, Depakote, Abilify, Ativan, Concerta, Ritalin, Topamax, Lamictal, Clonidine, Tenex, and Intunive.

"b-3. On or about April 2, 2011, the child was admitted to Enloe Hospital to rapidly wean the child off all his medications while monitoring his heart, in order to determine the correct required medications.

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

"b-4. [Mother] has reported the child having severe allergies to a wide range of foods resulting in the child complaining of hunger due to his very limited diet. Allergy testing during his hospital stay revealed only allergies to egg whites, bananas and seasonal allergy to pollen.

"b-5. [Mother] has repeatedly reported she is fearful of the child due to his aggressive, 'raging' behaviors toward her.

"b-6. [Mother] refused services that potentially could have resulted in the child returning to the home in a safe environment.

"b-7. During the child's hospital stay, April 2, 2011, through April 8, 2011, he was noted to comply with staff requests and played with only a couple of minor incidents of hyperactivity where he was easily redirected.

"b-8. Various professionals including but not limited to school personnel, Behavioral Health, Police, Emergency Medical Technician staff, and Enloe ER staff who are involved with the child on a frequent basis have neither observed nor documented any out of control/ raging like behaviors as described by [mother].

"b-9. [Mother] has a history of moving the child from the care of one doctor to another and has changed the child's school several times.

"b-10. The child's father has not maintained a relationship with the child."

The Department further alleged the minor was suffering, or was at risk of suffering, "serious emotional damage[]" as a result of mother's conduct. (§ 300, subd. (c).) Specifically, the Department alleged the minor was "at risk of suffering serious emotional damage[] as evidenced by the child's statement . . . that he has told his mother he wished that he had a different mom, or that he could be [section 5150'd] and the child admitted to striking the mother with objects, kicking her and calling her bad words."

4

In addition, the Department alleged that "after being instructed to not return to the hospital[, mother] went to the hospital and told the child he was being taken away from her because he was a bad boy at home, she was [losing] her parental rights and he will possibly never see her again. This caused the child's heart rate to increase to 140 beats per minute resulting in the monitoring company calling the nurses['] station to ask what was going on to cause the rapid increase in the child's heart rate."

At the detention hearing on April 14, 2011, the juvenile court followed the Department's recommendation and detained D.D. The juvenile court ordered mother not to discuss food or medications with the minor. It was further ordered that mother submit to a psychiatric evaluation.

*Jurisdiction*

The jurisdictional hearing took place over three different days, and was determined based on written offers of proof provided by the Department and mother.

*A. The Department's Proffer of Evidence in Support of Jurisdiction*

1. D.D.'s diagnoses were based solely on mother's reporting.

Dr. Dolinar would testify that, based solely on mother's reporting, D.D. had been diagnosed by several different physicians with a myriad of mental health disorders including bipolar disorder, oppositional defiant disorder, and attention deficit hyperactivity disorder (ADHD).

Neither Dr. Dolinar, nor any other physicians, clinicians, nurses, social workers, or teachers saw the mania or rages mother described. However, as a result of mother's reporting, D.D. had been prescribed a cornucopia of psychotropic medications including Abilify, Topamax, Lamictal, Clonidine, Tenex, Intunive, Seroquel, Depakote, Ativan, Concerta, and Ritalin.

At the time D.D. was admitted to the hospital in order to be weaned from his medication, he was taking a combination of Abilify, Depakote, and Intunive. While he

was in the hospital, hospital staff noted D.D. complied with their requests and played with only a few "minor incidents of hyperactivity" after which he was "easily redirected." Both during and after being weaned off his psychotropic medications, D.D. did not demonstrate any "mood disorders, mania or rages." He was described by hospital staff as "respectful, kind and cooperative" throughout his stay. A psychiatrist evaluated D.D. while he was in the hospital and diagnosed him with ADHD, but found it unlikely D.D. suffered from bipolar disorder.

Based on her treatment of D.D. and her interaction with mother, Dr. Dolinar concluded the following: "I am very concerned about [D.D.]'s safety as well as [mother's]. The more limits and requirements we set, the more [mother] escalates. Regardless of the secondary gain from having custody of [D.D.], I fear the possibility that she will hurt him or herself in order to 'prove' that he is violent. In my professional opinion, [mother] often acts delusional and inappropriate. She has expectations that do not meet his developmental age, and ability. It is, therefore, in [D.D.]'s best interest to be removed from her custody at least temporarily, until she has gotten [a] psychiatric assessment of herself to ascertain and treat the source of her behaviors."

2. <u>Mother insisted D.D. suffered numerous, severe food allergies</u>.

Mother also reported to Dr. Dolinar, as well as other care providers, that D.D. suffered from numerous, significant food allergies, which severely limited D.D.'s diet and frequently left D.D. hungry. Mother expressed that she was "worn out" as a result of the special diet D.D. had to maintain because of the allergies. During his stay in the hospital, D.D. was tested for allergies. Those tests showed D.D. was allergic only to egg whites, bananas, and pollen.

3. <u>Mother repeatedly changed D.D.'s schools and physicians</u>.

The Department also offered a psycho-educational report prepared by the Chico Unified School District (the School District) at mother's request, in which the School

District noted D.D., then in the second grade, had moved between eight different schools since entering kindergarten.[3] The School District concluded these moves were "excessive for a child who is in second grade." The School District also noted D.D.'s school records reflect D.D.'s struggle with academics as well as behavior. D.D.'s behavior problems were described as him having "difficulty keeping hands and feet to self, following directions, and socialization with peers (appropriate problem solving)." The School District concluded that the numerous changes in schools, along with the ongoing attendance problem negatively impacted D.D.'s ability to grow academically and learn how to socialize properly with his peers.

4. <u>Mother refused services and undermined the Department's efforts</u>.

In addition, the Department said mother had been offered numerous services and refused them. Specifically, Dr. Dolinar indicated she, along with the hospital and Butte County Behavioral Health, offered mother the "Hospital Alternative Program" (HAP), "Therapeutic Behavioral Services" (TBS), and counseling for the minor. According to Dr. Dolinar and the social workers, mother refused TBS services, saying the workers were not qualified to treat D.D. Mother agreed to HAP services and counseling for the minor; however, according to the social workers, she refused to execute the releases required to initiate these services.

The social worker also said that mother had been offered voluntary placement for D.D. Mother was initially interested, but she wanted placement only on the weekends. After learning weekend placement was not an option, mother refused this service as well.

---

[3] This was the second such report mother requested to determine D.D.'s eligibility as a child with "special needs." Specifically, mother claimed D.D. exhibited "attention and emotional difficulties." The year prior, mother suggested D.D. may have autism. The report concluded that D.D. "does not appear to meet eligibility criteria as a child with emotional disturbance."

Additionally, according to the social worker and Dr. Dolinar, mother was not compliant and worked to "undermine" the Department in its efforts to coordinate services for D.D. The social worker noted that when mother was told not to visit D.D. in the hospital, mother ignored the directive. Then, as recounted by the social worker, while visiting D.D., mother told him she was losing her parental rights because he had a been a "bad boy" at home.

The social worker also reported that, since D.D.'s detention, mother "continued to display behaviors that [were] dubious in the nature of her interaction with the child." For example, mother continued to believe D.D. had multiple severe allergies, repeatedly questioning D.D. about the food he was eating in foster care. The social worker also reported that, after they confirmed D.D. was allergic to bananas and cat dander, mother brought bananas and bags of cat hair to her visits with D.D. And, after being told not to bring food or other items to her visits with D.D., mother continued to "sneak" items into D.D.'s backpack.

### B. *Mother's Proffer of Evidence in Opposition to Jurisdiction*

Mother responded to the Department's evidence, with her own proffer of evidence. Mother said that all the diagnoses she reported were made by physicians. She conceded that numerous psychotropic medications had been prescribed for D.D., but said she never gave D.D. many of them and several of them she only gave him a few doses. Mother acknowledged D.D. was admitted to the hospital on April 1, 2011, but said it was "for a bipolar crisis," and the doctors did not begin to wean D.D. off of his medications until the following day.

Mother offered letters from numerous individuals, including friends and other care providers, each of whom witnessed D.D. acting "in an aggressive manner" toward others. She also included a report from D.D.'s first grade teacher, which noted that D.D.

8

" 'appears more active than his peers, exhibits more anger, and appears more defiant than his same age peers.' "

Mother advised that, when D.D. was five years old, she received lab results indicating D.D. had food allergies that affected his behavior. She relied on that information, educated herself regarding food allergies, and committed to eliminating those foods from his diet. Gary Incaudo, M.D., who examined D.D. in February 2010, said mother had been misdirected with regard to the link between what he referred to as D.D.'s food "sensitivities" and D.D.'s behavioral problems. Dr. Incaudo noted, however, that mother "seem[ed] quite open to understanding the science of food sensitivity and agreeable to proceed in a more scientific direction." He also noted that while mother expressed some "hesitancy" in moving away from treating D.D.'s behavioral issues with diet, he found that hesitancy to be "understandable . . . given the fact that she has been so fixated on food allergy for so long."

According to mother, while D.D. was hospitalized in April 2011, mother met with Kim Covington, who works for Butte County Behavioral Health. Covington referred mother to a local therapist and to "Parent Child Interactive Therapy." Mother agreed to those services, along with the HAP services offered by the Department. Mother also agreed to participate in TBS services through Youth for Change. She contends she was not offered additional services. Mother denied ever telling D.D. she would never see him again because he was a "bad boy."

Finally, in response to the Department's claim that mother repeatedly changed D.D.'s doctors and schools, mother stated that, while living in Santa Barbara, D.D. had one physician for two years: Dr. Bradley Hope. Since moving to Chico, D.D. had only one primary care physician: Dr. Dolinar. The other physicians who provided care for D.D. were specialists, treating D.D. in their area of expertise. She also reported that D.D.

9

remained at the same school in Chico for the last one-third of the first grade and all of second grade.

### C. The Court's Ruling

The juvenile court admitted the jurisdiction report prepared by the Department and mother's written response. After hearing argument from counsel, the court found true by a preponderance of the evidence, the remaining allegations in the petition. Accordingly, the court sustained jurisdiction over D.D. and adopted the Department's recommendations.

The court ordered reasonable visitation and gave the Department discretion to "place" D.D. with mother. The court also ordered mother not to bring to her visits with D.D. any food or other items to which D.D. may be allergic, ordered appointment of a court-appointed special advocate, and authorized psychological evaluations for mother and D.D.

### Dispositional Hearing

### A. Dispositional Report

In its dispositional report, the Department recommended continued foster care for D.D. and reunification services for mother.[4] Based on its investigation, the Department concluded D.D. was at risk if he was returned to mother's care because mother had not made significant changes to her behavior since D.D. was detained. In support of its conclusion, the Department found mother had not "acknowledged [D.D.]'s lack of allergies, his lack of raging out of control behavior, or demonstrated any indication she could benefit from services to reunite with her son."

The Department noted mother had completed the "Parent Support Group" but recommended she complete the class a second time and no further services would be

---

[4] The Department was unable to locate the presumed father, and thus recommended bypassing him for services.

10

provided to mother until she did. Mother also completed a drug and alcohol assessment, which found she had no problems with drugs or alcohol, and she signed the required releases for psychological testing (though she canceled the testing appointment on the advice of counsel).

### B. Dispositional Hearing

The dispositional hearing took place over six days in October and November 2011. Social worker Kathy Vanatta testified that D.D. was detained because he was overmedicated, mother claimed D.D. was abusive to her, and mother refused services. Vanatta also said mother continued refusing to sign releases to allow the Department to provide and monitor services for mother (though there was no delay in services for D.D.).

Vanatta testified that she had never seen D.D. be aggressive, depressed, or withdrawn, and she continued to be concerned that if D.D. did become aggressive with mother, that mother would harm him. In Vanatta's opinion, D.D. remained at risk in mother's care because mother continued to believe D.D. was ill and mother had not "modified" her behaviors.

Social worker Heather Murphy, coauthor of the disposition report, testified as well. Murphy acknowledged that by the time of disposition, mother had twice completed the Parent Support Group. Mother also was taking a parenting class. That class, however, was not a class approved by the Department, so the Department had no information about its content. Murphy also said mother would not sign the Department's approved releases. Instead, mother's counsel provided releases he drafted, but those releases were not acceptable to the Department.

Like Vanatta, Murphy never witnessed any aggressive behavior from D.D. or received any reports of him being aggressive, suicidal, or depressed. She too was concerned about what she described as mother's "medical-seeking" behavior. In her

11

opinion, D.D. was at risk if returned to mother's care because Murphy believed such behavior would continue.

Michelle L., the director of the preschool D.D. attended in Santa Barbara between 2006 and 2008, testified that while at her school D.D. exhibited behavioral problems several times a month. She described "angry outbursts" of kicking, hitting, and throwing things, but said other times he was "cooperative, and friendly, and appropriate." Michelle described mother as "cooperative" and "concerned" and discussed mother's investigation into diet as a means of modifying D.D.'s behavior without medication. It was Michelle who suggested mother have D.D. evaluated by medical and psychiatric professionals to help deal with his behavior problems.

Dr. Bradley Hope, who initially tested D.D. for food sensitivities in Santa Barbara, also testified. He said D.D. had been diagnosed with ADHD and he suggested to mother they try to treat the disorder with changes in D.D.'s diet rather than medication. He acknowledged the treatment was controversial, but believed it would be helpful. Dr. Hope never witnessed the behavior mother described as aggressive or violent, but understood (based on mother's reporting) the behaviors were improving with the modifications in D.D.'s diet. The only medication Dr. Hope ever prescribed for D.D. was for a foreskin infection and an ear infection.

Cynthia K. and Glowena E., both friends of mother's from Santa Barbara, testified that D.D. was normally a sweet, friendly child. Both observed, however, that he would also become aggressive and have to be separated from other children. They each described mother as calm during these episodes of aggression, speaking clearly to D.D. about his inappropriate behavior and putting him on a "time-out." They each also knew about mother's efforts to modify D.D.'s behavior by restricting his diet.

Dr. Incaudo testified that Dr. Hope's testing and theories were speculative and lacked validity. Dr. Incaudo tested D.D. for allergies and found D.D. had mild allergies

12

to grass, mold, eggs, and soy. The only significant allergies he found were to dogs, cats, and dust mites. Dr. Incaudo's colleague recommended to mother that she liberalize D.D.'s diet, reintroducing the foods that were previously precluded.

Dr. Incaudo described mother as cooperative and receptive to his advice; he expressed sadness that she had devoted so much time and energy to modifying D.D.'s diet in the hopes of modifying his behavior. He recognized it would take time for mother to adjust to the new information. Mother told Dr. Incaudo that D.D. had been diagnosed with Asperger's and bipolar disorder, but he never obtained confirmation of those diagnoses from a physician. Dr. Incaudo did recommend mother take D.D. to a pediatric psychiatrist for diagnosis.

Claire Fields, Ed.D., who completed a psychological evaluation of mother, testified as an expert in mental disorders. In her opinion, mother did not suffer from a mental disorder, though mother did have a personality disorder (narcissistic personality disorder) that would make it difficult for her to change her own behaviors and beliefs. Dr. Fields did not believe this would impact mother's ability to care for D.D.

Dr. Fields did not diagnose mother with Munchausen by Proxy Syndrome but, in her opinion, mother was abusing D.D. because Dr. Fields believed mother wrongly perceived D.D.'s behaviors as evidence of mental illness and thus subjected D.D. to unnecessary medical treatment and medication. Dr. Fields found mother's description of D.D.'s aggressive behavior incredible because no one else had witnessed such behavior, even in his foster placement. Dr. Fields was also concerned that mother continued to believe D.D.'s behavior issues were caused by food allergies. In her opinion, D.D. would be at risk if he was returned to mother's custody.

Eric Mart, Ph.D., an expert in Munchausen by Proxy Syndrome criticized the tests used by Dr. Fields in evaluating mother. In Dr. Mart's opinion, parents tended to score high on the compulsive, narcissistic, and histrionic area of the tests when engaged in a

13

custody dispute. Dr. Mart never met with mother, but noted that a diagnosis of Munchausen by Proxy in these circumstances would be undercut if other people had witnessed the behavior reported by mother. He also indicated that an improvement in the child's behavior in foster care would not prove the diagnosis because a child's behavior could improve in a new environment or because they are receiving treatment. Dr. Mart believed that if mother were suffering from Munchausen by Proxy, the risk to D.D. could be mitigated by having a primary care physician approve all medical referrals and/or having a therapist work with the family.

D.D.'s foster parent Jan C. testified that she had never seen D.D. act aggressively or out of control, or make threats. Since he had been in Jan's care, D.D.'s teacher had twice asked her to remove D.D. from the classroom because he was not following direction but he was never suspended from school. D.D. had been suspended from his after school program. Jan expressed concern that D.D. did not know how to interact with children his age. Jan also said D.D. was depressed because he missed mother. Overall, D.D.'s behavior was improving but he continued to struggle academically.

Mother's testimony supported her position that she sought medical treatment for D.D. in order to manage the aggressive behavior she witnessed. She was led to believe that dietary changes would help change D.D.'s aggressive behavior. Mother explained she was forced to change schools so often both because of D.D.'s allergies and his behavioral problems, and the decision to change schools was not always a voluntary one.

She also testified that since moving to Chico in 2009 Dr. Dolinar had been D.D.'s only primary care physician, the other physicians to which she took D.D. were all based on Dr. Dolinar's referrals. And, according to mother, it was Dr. Dolinar who suggested D.D. may have Asperger's syndrome and oppositional defiant disorder; it was also Dr. Dolinar who suggested D.D. may suffer from bipolar disorder or schizophrenia.

14

The psychiatrist to whom Dr. Dolinar referred D.D., Dr. Lynne Pappas, also suggested D.D. may suffer from schizophrenia, ADHD, seizures, and bipolar disorder. It was Dr. Pappas, as well as Dr. Dolinar, who prescribed many of the psychotropic drugs D.D. was taking. Mother stopped taking D.D. to Dr. Pappas at Dr. Dolinar's suggestion. Mother acknowledged taking D.D. to the emergency room six times since she moved to Chico for his cardiac arrhythmia[5] and twice for behavioral issues mother deemed emergent.

While D.D. was hospitalized in April 2011, Dr. Dolinar suggested mother go to Butte County Behavioral Health and D.D.'s therapist recommended mother participate in the HAP program, counseling and Parent Child Interactive Therapy. According to mother, she was "happy" to participate in those services. No services were offered, however, when D.D. was detained. Mother signed a release to participate in the "SAFE" program but never received a referral; she completed the Parent Support Group and attended parenting classes.

Mother explained that, through counseling, parenting classes and the Parent Support Group, she learned how her parenting style may have lead to D.D.'s tantrums and she learned how to better handle his issues. She denied ever making a false report and she continued to believe D.D. was allergic to soy products, eggs and bananas. Except for the soy, she now believed D.D. could consume the other foods in moderation.

Following argument, the juvenile court found by clear and convincing evidence that there was a substantial danger to the physical health, safety, protection, or emotional well-being of D.D. if he was returned home, and there was no reasonable means by which D.D.'s physical health could be protected without removal. The court ordered reunification services and authorized visitation that included overnight, weekend, and

[5] The cardiac arrhythmia was a confirmed medical condition.

15

extended visits.  The Department recommended removing the proposed requirements for drug assessment and testing and the court agreed.

Mother filed a timely notice of appeal.

## DISCUSSION

### I.  Sufficiency of Evidence to Support Jurisdiction

Mother contends the jurisdictional findings are not supported by substantial evidence.  We disagree.

"In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court.  We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies.  Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding.  [Citation.]  When the [juvenile] court makes findings by the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard  of review on appeal.  [Citation.]  The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order."  (*In re Cole C.* (2009) 174 Cal.App.4th 900, 915-916.)

Section 300 authorizes the juvenile court to adjudge a child a dependent of the court under certain specified circumstances.  (§ 300, subds. (a)-(j).)  A reviewing court may affirm a jurisdictional ruling if the evidence supports any of the counts concerning the children.  (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.)  Thus, dependency jurisdiction is appropriate where substantial evidence supports at least one jurisdictional finding, even if there are other findings that are not supported by substantial evidence.  (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.)

16

At jurisdiction, the Department presented numerous accounts of D.D. being overmedicated as a result of mother reporting aggressive behavior that no one other than mother had witnessed. As a result of mother's reporting, the minor was subjected to numerous medical and psychological tests, fed a severely restricted diet, and ultimately prescribed an abundance of psychotropic medications. In the opinion of D.D.'s primary care physician, Dr. Dolinar, all of those tests, the severe diet and the medication were unnecessary. Thus, based on her treatment of D.D., as well as her observation of mother, Dr. Dolinar concluded mother was putting D.D. at risk of physical harm.

In response, mother denied the Department's allegations. Mother continued to claim the minor often acted in an aggressive and threatening manner, so much so that she twice took him to the emergency room and once to the crisis center. Mother also offered letters showing that others, namely people living in Santa Barbara, had witnessed D.D.'s aggressive behavior. She defended D.D.'s diet, the numerous physicians, and the abundance of medications by arguing everything she did was pursuant to a doctor's order.

On appeal, mother isolates each of the allegations made in the petition and offers her own view of the evidence presented to support the allegations. Mother continues to take the position that everything she did, she did because she was following the doctor's orders. Again, however, as noted by Dr. Dolinar, the orders were based solely on mother's reporting. Accordingly, in Dr. Dolinar's opinion, none of the testing or treatment was warranted.

Viewing the record in a light most favorable to the judgment, as we are required to do, we conclude that Dr. Dolinar's conclusions based on the information she had were accurate. We further conclude that subjecting a child to multiple unnecessary medical tests and treatments puts that child at risk of serious physical and emotional harm. Thus, despite mother's denials, there was sufficient evidence to support a finding that D.D. was at risk of physical and/or emotional harm and to assert jurisdiction.

17

## II. Sufficiency of Evidence to Support Removal Orders

Mother contends the removal order is not supported by substantial evidence. Specifically, she claims any risk that previously existed did not exist at the time of disposition, and there were other means available to protect D.D.'s physical health short of removal.

Section 361 provides in relevant part that a dependent child may not be taken from the parent's physical custody unless the juvenile court finds clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if he or she were returned home, and "there are no reasonable means by which the [child's] physical health can be protected without removing" the child from the parent's physical custody. (§ 361, subd. (c)(1).)

Although the juvenile court must employ the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard of review on appeal. Mother has the burden of showing there is no evidence of a sufficiently substantial nature to support the order. (*In re Cole C., supra*, 174 Cal.App.4th at pp. 915-916.) This she has not done.

At disposition, mother presented testimony from people who knew D.D. when he lived in Santa Barbara and witnessed the aggressive behavior, as well as evidence from doctors who believed mother was acting out of genuine concern for D.D. Mother herself testified that she better understood her role in D.D.'s behavioral problems, and was more accepting of the reality that D.D. did not have an abundance of food allergies that contributed to these problems.

The Department presented evidence that mother continued to act as though D.D. was suffering from some as yet undiagnosed psychological disorder. Mother continued to dictate what services she believed were necessary and those that were not, rather than

18

participating in the services that were recommended by the Department. And, rather than acknowledge she may have been seeking unnecessary treatment for D.D., mother continued to defend the very behavior that resulted in D.D.'s removal in the first place. The Department thus concluded removal was warranted.

Again, we must consider the evidence in a light favorable to the judgment. (*In re Cole C.*, *supra,* 174 Cal.App.4th at pp. 915-916.) When we do that, it is clear there was sufficient evidence that not only did the risk of harm to D.D. persist, but mother showed an unwillingness to participate in the services required by the Department that would have been an alternative to removal. Accordingly, we find sufficient evidence to support the juvenile court's decision.

## DISPOSITION

The orders of the juvenile court are affirmed.


                                                  BUTZ         , J.


We concur:


           RAYE         , P. J.


          BLEASE       , J.