[No. B232428. Second Dist., Div. Two. Dec. 20, 2011.]

In re ASHLEY B., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent. v.
ALMA C., Defendant and Appellant.

COUNSEL

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Melinda S. White-Svec, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

CHAVEZ, J.—Alma C. (mother) appeals from an order adjudging Ashley B. (born Apr. 2008) a dependent of the court pursuant to Welfare and Institutions Code section 360, subdivision (d).[1] Specifically, mother argues that the court erred when it sustained a jurisdictional finding under section 300, subdivision (j) with respect to Ashley based on the circumstances leading to the death of her three-month-old brother, Jose.[2] We affirm.

## CONTENTIONS

Mother claims that a sustained count under section 300, subdivision (j) requires as a necessary predicate a sustained count under subdivision (a), (b), (d), (e), or (i) of section 300 as to the dependent child's sibling. Because the court failed to sustain a count under any of those subdivisions as to Jose, mother argues, the finding establishing jurisdiction over Ashley under count j-1 cannot stand.

Further, mother argues, even if a finding as to Jose was not legally necessary as a predicate to the finding as to Ashley under section 300, subdivision (j), substantial evidence does not support the juvenile court's finding that count j-1 was true based on the facts in the record.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother has given birth to three children: Ashley; Juan E., age 6; and Jose, who was born on August 4, 2010, and died on November 12, 2010. Only Ashley is subject to this appeal. The father of Ashley and Jose is Jose B.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Section 300, subdivision (j) provides that the court may adjudge a child a dependent child of the court if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e) or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

(father).[3] Mother, father, Ashley, and Jose resided together prior to the institution of these dependency proceedings. Juan had been living with his father, Juan E., Jr. (Juan's father), for approximately two years prior to the commencement of these proceedings.

### 1. Allegations regarding the death of Jose

Jose was born prematurely on August 4, 2010, and remained in the hospital until September 5, 2010. Mother reported that when Jose was discharged from the hospital, mother and father were given instructions for Jose to sleep on his back in a crib. Mother reported that Jose usually slept in a crib.

On the night of November 11, 2010, Jose was fussy and crying. Mother went to sleep around 10:30 p.m., while father stayed up to tend to Jose. Father fed Jose and then placed him in his crib, but he would not stop crying. Father took him out of the crib and placed him on his side in the parents' bed, and propped a bottle up to finish feeding him. Father then picked Jose up and burped him before putting him back down on his side on a pillow in their bed. Ashley, who was then age two, was also sleeping on the bed.

Father spontaneously woke up around 4:00 a.m. on November 12, 2010, and realized that he did not hear Jose breathing. Father got up and saw that Ashley had moved. She was lying across the top of the bed, across the pillows, and her right arm was on top of Jose's head. Father saw mucus on the pillow and cleared the mucus from Jose before beginning chest compressions. Father woke mother up and called 911, but Jose was already stiff, his face was white, and bloody discharge was draining from his nose. Paramedics responded to the family home, but they were unable to resuscitate Jose, and he was pronounced dead.

The Los Angeles County Department of Children and Family Services (DCFS) investigated the matter in the days following Jose's death. DCFS reported that Jose's crib was broken and full of clothes that appeared to have been there for a while, and that the parents had not followed the orders of their pediatrician that Jose sleep in his own crib on his back.

### 2. Investigation

Mother was interviewed on November 15, 2011. Mother explained that father would often stay up with Jose at night because mother worked long hours. Father confirmed that he was the primary caregiver for Jose and Ashley. Father disclosed that he was diagnosed with depression and was

---

[3] Father is not a party to this appeal.

taking psychotropic medication. Father stated that he would stay up at night with the baby due to mother's work schedule. Father and mother both confirmed the events of the night of November 11, 2010, leading to Jose's death.

Father disclosed that he was on disability because he had been diagnosed with depression in July. Father stated that he currently went to therapy once a week. Father admitted to drinking heavily prior to the birth of his children, Jose and Ashley. Father also admitted that he had started drinking alcohol again since the death of the baby. Father stated that he drank a 24-ounce beer daily to "mellow out," but he never drank to the point that he did not know what he was doing.

In a followup interview with father on November 24, 2010, father disclosed that mother had been doing crazy things and he was afraid she might hurt Ashley. Father said that he and mother had an argument at Jose's funeral the previous day, and that when they came back, mother packed her things and left, taking Ashley with her. Father then stated that when angry, mother had been physically abusive to Ashley. Father stated that one time mother slapped Ashley so hard that she knocked the wind out of her. Father also disclosed a physical altercation that took place while Jose was alive. Father was holding Jose and mother swung at him out of anger and hit the baby. Father stated the police came to the family home that day, but did not arrest mother when father did not press charges. Father claimed mother would come home angry from work, and when Jose was alive she would toss the baby around "like a rag doll."

Father further claimed that when Juan was in mother's care, mother was physically abusive towards him. Father claimed that one time mother punched Juan in the face and made the child bleed. Father stated that it was after this incident that Juan went to live with his father. Father told the DCFS social worker that after the social worker left their home to visit Juan at his father's house, mother called Juan's father and told him not to say anything about the past physical abuse.

Father disclosed that mother had been blaming him for Jose's death, and that he was afraid that she did not want to be with him anymore. He was also afraid because mother had left and taken Ashley with her, and he did not know where they were. Father admitted that he had been smoking marijuana, but stated that he had a medical card for marijuana use.

Mother was interviewed by telephone on November 24, 2010. She told the DCFS social worker that she did not want Ashley removed. Mother asked, "Can someone come look at her before you guys take her? She does not have

any bruises because I don't hit her like that." However, mother did not deny hitting Ashley, she only stated that she did not hit her hard enough to leave bruises. Mother stated that she and father had an argument the previous night and father made her leave the home. Mother stated that she stayed at a relative's house and that Ashley was with her grandmother. The social worker informed mother that Ashley would be picked up from the grandmother's home by DCFS.

On November 24, 2010, a DCFS social worker interviewed father's therapist. The therapist reported that he had been seeing father since June for depression. Father was prescribed antidepressants by a psychiatrist. Father's therapist believed that father was fine and able to care for the children. However, from what father had told him, he believed that mother was detached. The therapist had not heard about any physical abuse until father reported it that day. The therapist told father to inform DCFS.

Juan's father was interviewed on November 15, 2010. He reported that he had never known mother to be physically abusive towards her children. Juan's father reported that Juan had been in his care since he and mother separated. Mother would pick Juan up for visits on Saturday mornings and bring the child back the same day. Juan did not stay overnight at mother's because he would miss his paternal grandmother. Juan's father did not fear for Juan's safety when he was with mother. He believed mother was a good mother.

### 3. *Section 300 petition and detention*

On December 1, 2010, DCFS filed a section 300 petition on behalf of Ashley and her half brother Juan.

The petition alleged that mother and father established a detrimental and endangering home environment for the children. Specifically, on November 12, 2010, Jose was found dead in the children's home while in the care, custody, and control of mother and father, and that the manner of death would not ordinarily occur without the unreasonable and neglectful acts of mother and father. In addition, it was alleged that mother physically abused Ashley and father failed to take action to protect the child. It was also alleged that mother physically abused Juan, and that mother and father had a history of engaging in violent altercations, including an incident during which mother attempted to strike father but struck the now deceased child Jose instead. The petition further alleged that father had a history of substance abuse and was a current abuser of marijuana, and that father had a history of mental and emotional problems, including depression.

In its December 1, 2010 detention report, DCFS reported that Ashley was placed in a foster home, and Juan remained with his father. Ashley was taken

to a medical center on November 24, 2010, by her foster parents. Ashley had the "croup," a loud cough accompanied by difficulty breathing. The examiner reported that Ashley was dirty. Ashley had also appeared dirty when she was detained.

DCFS reported that mother had two prior referrals for child abuse: one for physical abuse of Juan by mother in September 1997, which was unfounded, and one alleging general neglect of Ashley by mother and father in January 2009, which was also unfounded.

DCFS recommended that Ashley be detained and Juan be ordered to remain in the care of his father. DCFS recommended that father and mother be granted monitored visits.

On December 1, 2010, the juvenile court found father the presumed father of Ashley. The court found a prima facie case for detaining the children; however, Juan was released to his father pending further hearing. The court ordered DCFS to investigate releasing Ashley to the care of her maternal aunt. The court ordered mother and father to have monitored visitation with Ashley. A pretrial resolution conference was scheduled for December 22, 2010.

### 4. Jurisdiction/disposition

DCFS filed a jurisdiction/disposition report on December 22, 2010. DCFS reported that Ashley had been placed with her maternal aunt.

In an interview on December 14, 2010, Juan disclosed that mother had hit him in the nose once when mother's boyfriend (presumably father) was present. Juan stated that he had blood on his nose from being hit. Juan stated that he did not tell his father about this incident because he was scared.

Juan's father stated that he did not know about this incident. Juan had not told him that he had been hit and Juan's father could not recall seeing any bruises on Juan after he returned from mother's house. However, Juan's father believed what Juan had disclosed about being hit by mother.

Juan's paternal grandfather remembered the incident. According to Juan's paternal grandfather, Juan returned from a visit to mother's house with blood on his nose. Mother told Juan's grandfather that Juan had fallen and hit his nose.

On December 14, 2010, the coroner reported to DCFS that the cause of death for Jose had not yet been determined.

DCFS had not been able to interview mother or father for the jurisdiction/disposition report, as both parents had been unavailable. DCFS recommended that Juan be placed with his father and the court issue a family law order granting Juan's father sole legal and physical custody of Juan, with monitored visits for mother. DCFS recommended that Ashley be declared a dependent, pursuant to section 300, subdivisions (a) and (b), but deferred its recommendation for services until the cause of death for the deceased sibling was determined.

The adjudication was set for January 25, 2011.

### 5.  *The coroner's report*

On January 25, 2011, DCFS submitted a last-minute information for the court, which attached the coroner's report. The coroner's report concluded that Jose's cause of death was sudden unexplained infant death. There was no evidence of trauma found during the autopsy. Accidental asphyxia from the bed sharing by overlay could not be proven or ruled out. It was undetermined whether external causes were involved in the child's death. The manner of the infant's death was undetermined.

It was noted that the child was born prematurely and suffered from apnea events while in the hospital. Jose weighed three pounds three ounces after his birth at 30 weeks. He was in the neonatal intensive care unit for one month, but was never on a ventilator. Mother informed the coroner's investigator that Jose was discharged from the hospital with instructions to sleep on his back in a crib. The coroner's investigator observed the parents' home and saw that in their bedroom there was a broken portable crib. In the bottom of the crib was a nest made of numerous blankets. Across the top of the crib was a tray used for storage, which had a black plastic bag on it that was falling into the crib.

It was also documented that the baby was placed to sleep in an adult bed between his parents, in a lateral position with his head on a pillow, and that his sister had fallen asleep in the far corner of the bed. When father awoke, he discovered the sister had moved over and was next to the baby with her arm on his head.

Based on the coroner's report, DCFS recommended that mother and father be provided with reunification services.

### 6.  *Interim review report*

In its interim review report filed January 25, 2011, DCFS reported that it interviewed mother on January 6, 2011. Mother explained that Jose had been

sick the week before his death, and she took him to a clinic because he had a stuffy nose. Jose was given an IV and some saline. Mother claimed that she did not remember the doctor's instructions that the baby should sleep on his back in a crib. Mother stated that Jose usually slept in his crib, but on the night of his death he would not stop crying. Mother admitted that there were things in Jose's crib, but stated that they were on the side of the crib and that the area where Jose slept was clear.

Mother claimed that father had told about her hitting Ashley because he wanted to keep Ashley. Mother admitted that she hit Ashley, but not to the point of making the child lose her breath. Mother stated that she only screamed at the child and spanked her "on the booty" and that Ashley did not have any bruises. Mother also stated that she did not hit Juan on the face, but may have hit him on the "butt." Mother remembered the day that Juan hurt his nose. She said that he fell on the pavement and scratched his nose.

Mother denied that father had been drinking alcohol. She stated that she wanted father to give up marijuana use so that they could get Ashley back. Mother admitted that she and father had violent altercations. She stated that father had socked, pushed and slapped her and that it had been going on for some time. Mother stated that she hit father, but she never hit him first. Mother did not think that she had hit baby Jose while father was holding him, but she admitted that she was not 100 percent sure.

Father was also interviewed on January 6, 2011. He stated that Jose had been sick the week before his death and that he and mother had taken the baby to the doctor. Father also did not recall the hospital instructing them that the baby should sleep in his crib.

Father now stated that he may have exaggerated some of the allegations about mother hitting Ashley because he was mad at the time. Father stated that mother hit Ashley, but not to the extreme that the child lost her breath. Father stated that the allegation about mother hitting Juan was true. Father denied that he had an alcohol problem or a problem with marijuana, and claimed that marijuana was helping his depression. Father stated he was willing to stop smoking marijuana if it was getting in the way of him getting his daughter back.

Father admitted that before he got treatment, he was "getting physical" with mother, but that had been over a year ago. Father stated that he had pushed mother and mother had called the police, but he was not arrested. Father stated that mother had hit him in the past, and the last incident was when she hit the baby instead. Father stated that he was trying to separate mother and his sister, who were fighting. Mother turned around to hit him, but hit the baby. Father stated it was not a hard blow.

DCFS reported that mother had enrolled in individual counseling, anger management classes, and parenting education.

The adjudication was continued to February 7, 2011.

### 7. *Adjudication and disposition hearing*

Mother and father were present at the February 7, 2011 adjudication and disposition hearing. Mother executed a waiver of rights form, and submitted the matter to the court on the documentary evidence with argument as to count j-1 only. The court received the documentary evidence without objection.

Mother's counsel argued that count j-1 should be dismissed. The allegation read, in its entirety: "**Count j-1:** The children, [Juan and Ashley's] mother, . . . and mother's male companion . . . father of the child [Ashley] established a detrimental and endangering home environment for the children and the children's now deceased sibling, three month old [Jose] (D.O.B.: 8/4/10). On 11/12/10, the children's three month old sibling was found dead in the children's home while the children's sibling was in the care, custody and control of the children's mother and the [father] of the children's deceased sibling [Jose]. The children's sibling was found not breathing, bleeding from the nose and stiffened body. Further, the manner of death of the children's sibling would not ordinarily occur without the unreasonable and neglectful acts of the children's mother and [father] who had care, custody and control of the children's sibling. Such conduct and neglect on the part of the children's mother and [father] of the children's deceased sibling endangers the children's physical and emotional health, safety and well-being, creates a detrimental home environment and places the children at risk of physical and emotional harm, damage and danger."

Mother's counsel noted that the coroner's report stated that there was no evidence of recent trauma or neglect and that the cause of death was listed as sudden infant death. Mother's attorney argued that mother was already asleep at the time father put the baby to sleep in their bed, and that mother was unaware that the baby was in their bed until after he died. Mother's attorney requested that mother at least be stricken from count j-1, or that the count be dismissed.

County counsel argued that there was sufficient evidence to support true findings as to the allegations under section 300, subdivisions (a), (b), and (j), and that those counts be sustained. County counsel noted that father did not abide by the doctor's instructions regarding Jose sleeping on his back in a crib, and that mother had a history of getting mad at the baby, shaking him,

and had hit the baby while trying to take a swing at father. Counsel for the children agreed that count j-1 should be sustained.

After argument by all counsel, the court found by a preponderance of the evidence that count j-1 was true as alleged. The juvenile court also sustained counts a-2, and b-5, as follows:

"**Count a-2:** On prior occasions, the children['s] . . . mother . . . physically disciplined the children Ashley and Juan. The mother's male companion, . . . the father of the child Ashley was unable to take action to protect the children. Such inappropriate discipline of the children by the mother and father's inability to protect the child endangers the children's physical and emotional health, safety and well-being, creates a detrimental home environment and places the children at risk of physical and emotional harm, damage, danger, physical abuse and failure to protect."

"**Count b-5:** The children['s] . . . mother . . . and the mother's male companion . . . the father of the child Ashley have a history of engaging in domestic altercations including the mother attempting to strike the father while the father was holding the now deceased child, [Jose] and the mother accidentally striking the child instead. Such violent conduct on the part of the children's mother and the [father] endangers the children's physical and emotional health and safety and places the children at risk of physical and emotional harm, damage and danger."

All other counts and allegations were stricken. The court found by clear and convincing evidence, pursuant to section 361, subdivision (b), that there was a substantial danger to the children if they were returned home to mother and father.

The court ordered Juan placed in the home of his father, and terminated jurisdiction over Juan with a family law order granting his father full legal and physical custody, with monitored visitation for mother.

The court ordered reunification services for mother, including domestic violence counseling, parent education, anger management, and individual counseling to address case issues. Father was also ordered reunification services, which included taking 10 consecutive random drug and alcohol tests, parent education, domestic violence counseling, individual counseling to address depression, and to maintain compliance with his prescribed medication and therapy. The court ordered mother and father monitored visits with Ashley. The parents were not to visit Ashley together at first. The court granted DCFS discretion to liberalize the parents' visits. A review hearing was scheduled for August 8, 2011.

8. *Notice of appeal*

On April 5, 2011, mother filed her notice of appeal from the court's section 300, subdivision (j) jurisdictional finding only.

## DISCUSSION

I. *Jurisdiction is proper*

Mother contends that the trial court erred in sustaining count j-1 of the section 300 petition. However, mother does not challenge dependency jurisdiction based on the allegations sustained under counts a-2 and b-5.

The sustained allegations against mother and father under counts a-2 and b-5 bring Ashley within the jurisdiction of the juvenile court. As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate. (*Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72 [74 Cal.Rptr.2d 770]; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875–876 [7 Cal.Rptr.2d 277] (*Jonathan B.*).)

Because mother does not challenge the court's other jurisdictional findings, we need not consider mother's challenge to the juvenile court's decision to sustain count j-1. As set forth in *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 [90 Cal.Rptr.3d 44]: "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. [Citations.]"

We will not reverse for error unless it appears reasonably probable that, absent the error, the appellant would have obtained a more favorable result. (*Jonathan B., supra*, 5 Cal.App.4th at p. 876.) Because jurisdiction was proper on other grounds, mother cannot expect a more favorable result, and we need not consider her appeal.

II. *The court did not err in sustaining count j-1*

Though we need not consider mother's arguments as to the propriety of count j-1, since jurisdiction of Ashley was properly established under section 300, subdivisions (a) and (b), even if we were to consider mother's arguments, they would fail.

Mother makes two arguments for reversal of the jurisdictional finding under count j-1. First, she argues that the court's finding as to count j-1 was "legally infirm," because a sustained count under section 300, subdivision (j) requires as a necessary predicate a sustained count under one of the other subdivisions as to the child's sibling.[4] Next, she argues that, even assuming that the law permitted the court to assert jurisdiction over Ashley under subdivision (j), the facts do not support a finding that count j-1 is true with respect to mother. We briefly discuss each of mother's arguments below, and conclude that neither argument would prevail.

A. *Subdivision (j) of section 300 does not require an express finding regarding the subject child's sibling as a prerequisite to jurisdiction*

Section 300, subdivision (j), states that jurisdiction is proper if: "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

On its face, section 300, subdivision (j) does not require that the court make an express finding under section 300 as to the subject child's sibling. Where, as here, the abused or neglected sibling is deceased, the trial court need not sustain predicate findings on behalf of the deceased sibling. Under these circumstances, it is sufficient that the juvenile court made an implied finding that the deceased sibling was abused or neglected as defined in one of the enumerated subdivisions of section 300. (See *In re Elijah S.* (2005) 125 Cal.App.4th 1532, 1545–1546 [24 Cal.Rptr.3d 16] ["We conclude that . . . the juvenile court made an implied determination that the deceased minors came within the definitional descriptions enumerated in section 300, and were therefore within its jurisdiction . . . ."].)

The cases cited by mother do not suggest that an express jurisdictional finding as to the sibling must exist as a predicate to jurisdiction under section

---

[4] We note that mother did not make this legal argument below. Generally, the legal sufficiency of a petition cannot be challenged for the first time on appeal. (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 82–83 [105 Cal.Rptr.3d 645]; *In re David H.* (2008) 165 Cal.App.4th 1626, 1636–1640 [82 Cal.Rptr.3d 81].) However, as set forth below, even if mother had not forfeited her challenge to the legal sufficiency of the petition, her challenge would fail.

300, subdivision (j). First, mother cites *In re Joshua J.* (1995) 39 Cal.App.4th 984 [46 Cal.Rptr.2d 491] (*Joshua J.*). In *Joshua J.*, two-week-old Joshua was detained because his half brother had been physically abused by Joshua's father some years before. The court took judicial notice of the findings and orders made in five related dependency proceedings involving Joshua's father's five older children. (*Id.* at p. 987, fn. 2.) The *Joshua J.* court affirmed that section 300, subdivision (j) has two elements: first, that the minor's sibling has been abused or neglected, and second, that there is a substantial risk that the minor will be abused or neglected. (39 Cal.App.4th at p. 992.) While the first element of section 300, subdivision (j) was satisfied in that case with a true finding in a separate proceeding as to Joshua's half brother, the case does not suggest that it is mandatory that an express true finding be made in every case as a prerequisite to jurisdiction under subdivision (j). Instead, it affirms the language of the statute, which permits such a finding to be express or implied.

Next, mother cites *In re Janet T.* (2001) 93 Cal.App.4th 377 [113 Cal.Rptr.2d 163] (*Janet T.*). In *Janet T.*, the Court of Appeal determined that "the allegations of the petition sustained under section 300, subdivision (b) are not sufficient to support jurisdiction." (*Id.* at p. 391, fn. omitted.) Thus, the court concluded that "It necessarily follows the sustained allegation of sibling abuse alleged under section 300, subdivision (j) must fail as well." (*Ibid.*) The *Janet T.* court specified that the validity of the subdivision (j) finding "in this case was dependent on a sustained finding of a substantial risk of serious physical harm or illness under subdivision (b)." (93 Cal.App.4th at pp. 391–392, fn. omitted.) Again, the *Janet T.* court did not suggest that a sustained finding is a prerequisite in *all* cases. In fact, the language that the court used expressly limited its finding to the matter before it. The court did not consider a situation where, as here, the abused or neglected child is deceased and thus not a subject of the section 300 petition.[5]

■ Mother has failed to convince us that the juvenile court was required to sustain a separate count as to Jose as a legal prerequisite to its finding under section 300, subdivision (j) as to Ashley. The court's implied finding

---

[5] Mother admits that Jose was not a subject of the petition, and that DCFS obviously could not have sought to have him declared a dependent of the court. However, she argues that "nothing in section 300 would have precluded the court from finding Ashley or Juan at risk of substantial harm based on intentional or negligent acts committed by mother with respect to Jose." Mother points out that DCFS initially included allegations seeking to have mother found intentionally or negligently liable for Jose's death, but that the juvenile court did not sustain those allegations. While we agree that the juvenile court was not precluded from sustaining such findings, mother has not convinced us that the court was *required* to sustain them as a prerequisite to its finding under section 300, subdivision (j).

that Jose was a victim of abuse or neglect as defined in section 300 in connection with his death is sufficient to support a finding that Ashley was at risk under subdivision (j).

### B. *Substantial evidence supports the court's findings as to count j-1*

Next, mother argues that even if an express finding as to Jose was not required, substantial evidence did not support the trial court's implied determination that mother was abusive or neglectful in connection with Jose's death. Mother points out that the coroner determined that Jose died of sudden unexpected infant death, and that he showed no signs of abuse or neglect. Moreover, mother argues, the record demonstrates that on the night Jose passed away, mother had no involvement in father's decision to place Jose in the family bed to sleep, and she had no knowledge of father's decision until after Jose died. Mother admits that she may have had other failings, but she insists that there was insufficient evidence to show that she contributed to Jose's death.

The court's jurisdictional findings are reviewed for substantial evidence. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318–1319 [49 Cal.Rptr.2d 139].) If we were to consider mother's arguments, we would conclude that substantial evidence supports the juvenile court's jurisdictional finding under count j-1. Specifically, we would conclude that substantial evidence supports an implied finding that Jose was abused or neglected as defined in section 300, subdivision (b). (See § 300, subd. (b) [the child "has suffered . . . serious physical harm . . . as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child"].)

The evidence before the juvenile court showed that mother and father ignored the discharging hospital's instructions that Jose, a premature infant who had suffered from sleep apnea while hospitalized, should be placed to sleep in his crib on his back. Both DCFS and the coroner noted that Jose's crib was broken and contained a nest of bedding, and that a tray on top of the crib appeared to be used for storage. This evidence was sufficient to support a conclusion that neither mother nor father was ensuring that Jose was put to bed safely.

Mother's argument that she was asleep at the time Jose was put to bed does not relieve her of responsibility. As explained above, the evidence suggested that, contrary to mother's statements, Jose was not usually put to bed in his crib. Even if mother did not put him to bed every night, mother's failure to protect the child from father's neglectful acts is sufficient to support the juvenile court's finding as to mother under section 300, subdivision (j).

■ Further, under section 300, subdivision (j), the juvenile court is permitted to consider "the circumstances surrounding the abuse or neglect of

the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." This "broad language . . . clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in [section 300,] subdivision (j)." (*In re Maria R.* (2010) 185 Cal.App.4th 48, 64 [109 Cal.Rptr.3d 882].) Under this expansive statutory language, the juvenile court was also permitted to consider father's allegations that mother threw Jose around like a rag doll, and carelessly hit him when taking a swing at father.

The evidence described above supported an implied finding that Jose was abused or neglected as defined in section 300, subdivision (a) (serious physical harm) or (b) (inadequate care). An implied finding of abuse or neglect of Jose under either of those subdivisions is sufficient to support a finding under section 300, subdivision (j) as to Ashley.

## DISPOSITION

The judgment is affirmed.

Boren, P. J., and Ashmann-Gerst, J., concurred.