Filed 10/25/21  In re J.J. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re J.J. et al., Persons Coming Under the Juvenile Court Law. _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>Jason J.,<br><br>        Defendant and Appellant. | B309700<br><br>(Los Angeles County Super. Ct. No. 19CCJP04452A-C) |

        APPEAL from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Commissioner.  Dismissed in part and affirmed in part.

        Jesse F. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court asserted jurisdiction over three young children and denied their father custody.  The mother had left the children with the Department of Children and Family Services because she was unable to care for them.  Earlier, one of the children had suffered a facial and ear injury while in the father's care.  The court made jurisdictional findings about each parent.  The father alone appeals jurisdiction and the order denying him custody.  We dismiss his challenge to jurisdiction as nonjusticiable and otherwise affirm.  Undesignated statutory references are to the Welfare and Institutions Code.

I

This appeal involves three children:  J.J. (born September 2015), V.J. (born December 2016), and C.J. (born February 2018).

The father lives in Arkansas.  The children lived with the mother in Arkansas until approximately December 2018, when the mother took them to Missouri and then to Los Angeles.

The father did not give the mother money on a scheduled basis for the children's care because the mother "was not stable enough to even take the money."  He said he bought clothes and other things the children needed.

When the children lived in Arkansas, they rarely stayed overnight with the father.  Once, in May 2018, J.J. and V.J. stayed with the father for about a week.  This was the longest time they stayed with him.  V.J., who was 17 months old at the time, had bruises on his face and ear at the end of the visit.

2

The Arkansas Department of Human Services investigated V.J.'s injury. A doctor examined V.J. and said accidents rarely cause ear bruising. Forceful grabbing or pinching the ear or a "significant blow" to the ear would most commonly cause the type of bruising V.J. had.

The father told the Arkansas agency he had no idea what caused the bruises but V.J. had jumped into a pool and his face hit the water. V.J. had also ridden on an all-terrain vehicle and a tree branch may have struck him. The doctor said V.J.'s bruising was not consistent with the pool or branch explanations.

In 2019, when the Department inquired about V.J.'s earlier injury, the father admitted there were a few incidents during the May 2018 visit where V.J. might have gotten hurt. V.J. "must have had an allergic reaction from either jumping in the pool or maybe he scratched himself when he was riding his 3-wheeler."

Records show in June 2018 the Arkansas agency substantiated the report alleging abuse of V.J. based on this injury. In 2019, however, the Arkansas agency told the Department it lacked additional records and there were no court orders involving the family.

As of December 2020, the father last saw the children at J.J.'s third birthday, which was in September 2018.

In approximately December 2018, the mother left Arkansas with the children. According to the father, the mother would regularly "throw a tantrum" and leave with the children for about two weeks or a month at a time without contacting him. She did this "all the time." "I wouldn't know where she was at."

When the mother left with the children, the father did not call child protective services because he did not think the kids were in danger. He thought the mother was "having her little

moments." He never went to a family law court to request full custody of the children. He did not contact law enforcement. "I never knew you could do that."

In Los Angeles, the mother and children primarily lived in a car. On July 11, 2019, the mother brought the children to a Department office in Pasadena and asked the Department to take the children because she could not care for them. The mother wrote an affidavit consenting to the Department detaining the children.

That day, three-year-old J.J. said she was hungry and had not eaten dinner the night before. J.J. said the mother had hit her with a belt in the past. The mother later admitted hitting J.J. with a belt.

In July 2019, the father said he had no idea the mother had taken the children to Los Angeles. He did not know where they were until the Department contacted him.

A Department social worker visited the father's home in Arkansas in January 2020. The home was clean and safe.

On July 10, 2020, the court held an adjudication hearing. It sustained jurisdiction under section 300, subdivision (b), based on the mother's inability to care for the children and her inappropriate physical discipline of J.J., as well as the father's neglect that led to V.J.'s bruises. The count involving the father said V.J.'s injury was not consistent with the father's explanation and "would not ordinarily occur except as the result of neglectful acts by the child's father, who had care, custody and control of the child."

The children's foster parent said the father infrequently called the children. As of August 2020, the father had made three or four short calls in eight months. A month after the

Department arranged a schedule for the father to call the children five days a week, the father had called once. The father said he disliked associating with the children's foster parents.

The father did not participate in counseling or parenting programs. The Department sent the father referrals by mail and email.

On December 7, 8, and 9, 2020, the court held a disposition hearing over video.

The father testified.

He described V.J.'s May 2018 injury as "dots on the side of [V.J.'s] face." The father said this was an allergic reaction from playing in grass and "[i]t looked like an ant bite or something because he was playing in the sand and stuff." The father denied ever putting his children at risk.

The father disputed the foster parent's account about his communication with the children. He said he had called every day for three months and was allowed to speak to the children only once.

The father denied receiving referrals for services. He tried to enroll in an online parenting class but there was a waitlist. "So that was me trying." He was willing to participate in counseling, "[b]ut I'm not the one that needs it."

The father yelled at the end of his testimony and at the end of the proceedings. He repeatedly interrupted when the court and attorneys were speaking.

Counsel for the children and the Department advocated against the father having custody.

The court removed the children and ordered family reunification services. It found it would be detrimental to place the children with the parents and found by clear and convincing

5

evidence it would pose a substantial danger to release the children to the parents.

The court based its decision on the father's failure to acknowledge he was negligent regarding V.J.'s injury and his failure to report when the mother took the children for long periods of time. The father "does not think he did anything wrong." The father did not attempt in-person contact with the children over their two years in California. The court did not credit the father's assertion he did not get referrals for services. It also noted the father had been yelling and hostile during the proceedings.

II

A

The father challenges the court's jurisdictional findings. An appellate court need not address jurisdictional findings involving one parent when there are unchallenged findings involving the other parent. (*In re Briana V.* (2015) 236 Cal.App.4th 297, 308–310 (*Briana V.*).) We generally view such challenges as nonjusticiable. (*Id.* at p. 308.) The court sustained jurisdictional findings against the father and the mother. The findings against the mother are unchallenged, therefore we need not address the father's jurisdictional challenge.

We have discretion to address the merits of a jurisdictional challenge where, for example, the findings serve as the basis for challenged disposition orders or could affect current or future dependency proceedings. (*Briana V., supra,* 236 Cal.App.4th at p. 309.)

The father asks us to exercise our discretion because the jurisdictional findings against him make him an offending parent. He offers three ways the offending parent status affects

6

him: (1) it affects whether the court should have removed the children from his physical custody under section 361; (2) it affects the way the court makes dispositional orders under section 362, subdivision (a); and (3) he could be prejudiced "in all future proceedings and could have 'far-reaching' consequences respecting future dependency proceedings and [the father's] parental rights."

As to the first reason, the only part of section 361 that mentions offending parents is section 361, subdivision (c)(1), which addresses jurisdiction under section 300, subdivision (e). This is irrelevant to the father's case because the court sustained jurisdiction over the children under section 300, subdivision (b), only.

Second, section 362, subdivision (a) says nothing about offending parents. When the court has jurisdiction over a child, that section allows the court to make reasonable orders for the child's care. (*Ibid.*) Jurisdiction attaches to the children, not the father, so the court could impose dispositional orders involving the father based on the findings against the mother. (See *In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.)

The father's third reason is vague and speculative.

The father has not provided any identifiable adverse consequence of the jurisdictional finding against him. We decline to exercise our discretion to reach the merits of his challenge and dismiss this portion of his appeal.

B

The disposition order denying the father custody was proper.

We review the order for substantial evidence and we account for the high probability the clear and convincing

7

standard of proof demands.  (*In re R.T.* (2017) 3 Cal.5th 622, 633; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, 1009, 1011.)

The father says he was a noncustodial parent, therefore section 361.2, subdivision (a) applies.  That section requires the court to place children with a noncustodial parent if that parent requests custody, unless the court finds placement with that parent would be detrimental to the children's safety or well-being.  (*Ibid.*)

The Department disagrees and says section 361, subdivision (c) applies.  That section allows a juvenile court to remove children from a parent's custody only if it finds by clear and convincing evidence there would be a substantial danger to the children's safety or well-being if the children were returned home and there are no reasonable means to protect the children without removal.  (*Ibid.*)

The juvenile court made findings under both sections and under either standard, substantial evidence supports the court's order.  On the single occasion in which V.J. and J.J. were with the father for an extended period, V.J. suffered an injury.  A doctor explained this type of injury would typically come from forceful grabbing, pinching, or a significant blow.  The father minimized the bruises as mere "dots" caused by an allergic reaction.  His various explanations were dubious and inconsistent with the doctor's analysis.  Although the injury was to a 17 month old in his care, the father did not accept responsibility for it.  Instead, he denied ever putting his children at risk.  This supported the detriment and substantial danger findings.

The father's failure to take protective action when the children went missing also supports the court's findings.  The father did not learn the children's location until more than six

months after they left Arkansas when the Department contacted him. The father described the mother as not being stable, therefore his lengthy inaction was a proper source of concern for the court. And his inaction was consequential—the children lacked proper shelter, food, and care with the mother in Los Angeles. Once he had the children's contact information, the father infrequently called them. The father's inaction and inattention in this context helped prove it would be detrimental and a substantial danger to the children to place them with him.

The father's credibility also supported the court's findings. The court discredited the father's assertion he did not receive referrals. This was proper. The father says this had minimal relevance, but his false statement cast an unfavorable light on the rest of his testimony. (See Evid. Code, § 780.) The father's credibility together with the other evidence we recounted constitute substantial evidence of detriment and substantial danger to the children.

## DISPOSITION

We dismiss the father's appeal as to jurisdiction. We otherwise affirm.

WILEY, J.

We concur:

STRATTON, Acting P. J.          OHTA, J.*

---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9