Filed 4/26/23  In re E.W. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re E.W. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>E.P.,<br><br>    Defendant and Appellant. | G061914<br><br>(Super. Ct. Nos. 22DP0829, 22DP0830, 22DP0831)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Robert Gerard, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, and Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

\*            \*            \*

E.P. (Father) is the presumed father of E.W, born in 2005, Z.W., born in 2006, and F.W., born in 2009 (collectively the Children). The Children were taken into protective custody in July 2022 after law enforcement responded to a 911 call placed by E.W. and Z.W. The Children were detained and, in October 2022, following a dispositional/jurisdictional hearing, the juvenile court found the Children came within Welfare and Institutions Code section 300, subdivisions (b)(1), (c), and (g),[1] declared them to be dependent children, and vested custody with the Orange County Social Services Agency (SSA).

Father appeals from the juvenile court's jurisdictional order.[2] Father argues substantial evidence does not support the court's jurisdictional findings. We conclude substantial evidence supported jurisdictional findings under section 300(b)(1) and therefore affirm without considering whether substantial evidence supports any of the other alleged statutory grounds for jurisdiction.

## FACTS

The following facts are taken from SSA's detention report filed on July 12, 2022, SSA's Jurisdiction/Disposition Report filed on August 8, 2022, and five addendum reports bearing dates starting with August 23, 2022, and ending on October 17, 2022. These reports were received into evidence at the jurisdictional hearing.

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] The whereabouts of the Children's mother (Mother) are unknown and she is not a party to this appeal.

2

I. *Events Leading to Detention*

On July 8, 2022, E.W. and Z.W. called 911 from a gas station located across the street from the motel they were staying at with Father and F.W. The Father and the Children had been in California for only a few days. Father had driven them across the country from Virginia, where they had lived for over 10 years in the home of Father's girlfriend. Father's girlfriend asked them to leave after she and Father had a verbal altercation.

According to E.W. and Z.W., the home environment in Virginia was "toxic" with energy that was "always bad," particularly the past two years due to the frequent verbal altercations between Father and his girlfriend. The arguments were always verbal and never escalated to physical violence. Father's girlfriend had an "awful attitude" toward the Children. E.W.'s and Z.W.'s school attendance and grades suffered as a result of the home environment and "everything being crazy." Father's girlfriend finally asked Father and the Children to leave.

In early June 2022, Father and the Children left Virginia. Father had no plan but drove to several states to seek resources. If a state did not have the "right resources" Father would drive on. Some nights Father and the Children slept in the car, sometimes Father asked people for money and, if he saved enough money, they would stay in a hotel.

Father drove the children to Texas where they stayed with the Children's maternal grandmother, F.H. (Maternal Grandmother), for a few weeks. While the Children were in Maternal Grandmother's care, Father traveled in search of resources. Father initially intended to leave the Children in Maternal Grandmother's care while he made living arrangements and obtained employment in California. But when Maternal Grandmother asked for legal authorization to be able to seek any necessary medical care for the Children and enroll them in school, Father accused her of trying to gain custody and took the Children with him to California. E.W. and Z.W. contacted Maternal

3

Grandmother and begged her to take them back, and, according to E.W., F.W. "would cry on and off because he didn't want to leave" Maternal Grandmother.

Father was angry during the trip to California because he believed the children were unhappy to be in his care. Maternal Grandmother and the Children's adult maternal half-sibling purchased bus tickets for the Children so they could return to Texas. Father agreed to drive the Children to the bus station but threatened to call the police if they left. The Children never made it to the bus station, but Father called the police anyway and was yelling and angry when he called.

Upon arrival in California the family was homeless. Father did have enough money to rent a room at a cheap motel one evening. The room was filthy, ridden with cockroaches, and the door did not shut properly. E.W. and Z.W. went to sleep in the car. Once Father noticed they had left he walked out to the car. He yelled and cursed, demanded E.W. and Z.W. return to the room, and tried to physically remove them from the car.

E.W. went back to the room and retrieved her cellphone, but Father slammed the door shut and refused to let her exit the room. Z.W. was left outside alone. Father was angry, and when E.W. tried to leave, he pushed her. She fell and hit the sink. Father struck her on the right side of her face. E.W. screamed, and he stopped. E.W. grabbed Father's cellphone and fled with Z.W. to the nearest gas station where they made the 911 call.

Law enforcement arrived and arrested Father on an outstanding out-of-state warrant for assaulting a police officer. The Children were taken into protective custody and placed at the Orangewood Children and Family Center.

The Children had had no contact with Mother, who they said had a severe drug problem, and had not seen her in about six years. Father confirmed Mother's whereabouts were unknown. Maternal Grandmother described Mother as a "lost soul."

4

Father's former girlfriend, with whom Father had a child, described Father as an excellent Father who never engaged in domestic violence. Father's adult daughter, D.C., described Father as loving, kind, smart, and very protective. According to D.C., Father did not drink or use drugs and would never hurt his children. Maternal Grandmother also said that Father "is not a violent man, does not drink alcohol or do drugs."

II. *Father's Mental Health Status*

As long as E.W. could remember, Father had shown signs of paranoia. While in Virginia, Father refused to leave the home for eight years (except for appointments) because he believed that "people were after him." Z.W. believed that Father "has something wrong with his brain and thinks people are after him."

The incident leading to the arrest warrant was documented in a Baltimore Police Department report dated April 17, 2016. Police had been called because Father believed he was being followed by someone who wanted to kill him. A police officer spoke with Father and described him as "extremely delusional, paranoid and suicidal." Father claimed he was being followed by a gang from Virginia and he had come to Baltimore to hide out. Father thought the police were working with the gang to kill him. Father spoke extremely fast, constantly changed the subject, and spontaneously changed emotions. When an officer asked for Father's identification, Father exclaimed, "I'm a dead man," and attempted to run away. An officer concluded that Father was a threat to himself and was possibly in danger and approached him in an attempt to discourage him from leaving. Father lunged toward the officer and bit his right ear, which caused punctures and lacerations. Father bit the officer's thumb when the officer tried to defend himself and bit the officer's thigh when the officer tried to restrain him.

Once restrained, Father was taken to a hospital. During a psychological evaluation, Father "became extremely irate, violent, and verbally threatening to

5

uniformed officers, security and hospital staff." Father required sedation and was placed on an involuntary psychiatric hold.

Father denied having any mental health concerns, hospitalizations, or medication.

III. *E.W.'s Mental Health Status*

E.W. also was dealing with mental health issues. She reported that at age 13 she had started "self-harming behaviors" and had begun using nicotine, marijuana, and pills. She would use a razor blade to cut herself on her left forearm, and she had several scars from the cuts ranging from one to two inches long. E.W. had cut herself about one month before being taken into protective custody. She had attempted suicide one to two years earlier by overdosing on pills she had found in the paternal grandmother's home. After swallowing the pills, she vomited. She did not disclose the suicide attempt to anyone until recently. She recently had not had any suicidal ideations.

Father became angry with E.W., when, after arriving in California, he first noticed scars on her arm. E.W. reported that Father "cannot be there for [her] emotional needs as he has told her in the past she is 'crazy' for feeling how she expressed feeling." E.W. found it difficult to speak with Father about her mental health.

When E.W. was younger, she participated in online support groups. She enjoyed the support groups because people were willing to talk and listen. In December 2021, she used her own birthday money to pay for two months of counseling services.

Later, E.W. was able to obtain mental health services as part of the court-ordered reunification. E.W.'s therapist reported that E.W. was possibly struggling with eating disorders, which she was able to hide from Father because he was not involved with her well-being. E.W. was depressed but motivated to address and manage her mental health difficulties with continued therapy and psychiatric care.

# PROCEDURAL HISTORY

I. *Detention and Dependency Petition*

A dependency petition was filed on July 11, 2022. At the detention hearing on July 14, 2022, Father denied the allegations of the petition. The juvenile court found Father to be the presumed Father and ordered the Children be detained. The court ordered an expedited evaluation of Maternal Grandmother for placement in Texas under the Interstate Compact on the Placement of Children.

An amended dependency petition (the Petition) was filed on August 23, 2022. The Petition included one count each of failure to protect (§ 300, subd. (b)(1)), serious emotional damage (§ 300, subd. (c)), and no provision for support (§ 300, subd. (g)). Under allegation (b)(1), the Petition alleged Father had unresolved mental health issues, Father had been arrested on July 8, 2022, due to being a fugitive in Maryland, the whereabouts of Mother were unknown, and the Children were left with no available caretaker.

In addition, the Petition alleged that Father has not ensured the mental health needs of E.W. are consistently and adequately met (allegation b-4), that Father does not have a safe and stable home and has not ensured the Children's needs for adequate shelter have been consistently and adequately met (allegation b-5), and that Father had physically abused E.W. (allegation b-6).

Under the count for serious emotional damage, the Petition repeated allegations that Father has not ensured the mental health needs of E.W. are consistently and adequately met (allegation c-1), that Father does not have a safe and stable home and has not ensured the Children's needs for adequate shelter have been consistently and adequately met (allegation c-3), and that Father has physically abused E.W. (allegation c-4). Under the count for no provision for support, the Petition alleged that Father "is not

7

available to provide appropriate care for the children and lives in a separate state from the children."

II. *Reunification Services*

The juvenile court ordered SSA to provide Father with housing referrals and reunification services "as soon as possible." After Father was released from custody on August 12, 2022, he lived in his car. Several days later, the assigned social worker contacted Father to discuss the dependency case and services SSA would provide him. Father was given an action plan which included a recommendation that Father participate in individual counseling and undergo a psychiatric evaluation. Father denied having a mental health problem and told the social worker that "the system was stereotypical and placing him in a category without getting to know him." Father said he did not want services to be "a mandate" and his "main priority" was "to secure housing in order for the [C]hildren to reunify in his care."

The social worker invited Father to attend a child and family team meeting (CFTM) at which a California Work Opportunity and Responsibility to Kids (CalWORKs) representative would be able to help him find housing.[3] The conversation ended with Father saying he intended to leave California because it is a "racist state."

Father attended the CFTM held on August 18, 2022. A CalWORKs representative was present to assist him. Father was advised that to have access to medical care, food stamps, and housing, he had to apply for CalWORKs in Orange County. Father declined to enroll in CalWORKs because he wanted to wait for the result of the jurisdictional hearing, which was set for August 23, 2022. Father said he would

---

[3] "CalWORKs is a public assistance program that provides cash aid and services to eligible families that have a [child or children] in the home." (https://www.cdss.ca.gov/calworks [as of April 26, 2023], archived at: https://perma.cc/W9TJ-VEG9.)

apply for benefits once the Children were returned to him.  Father was provided a housing referral, but he declined it because he wanted to wait for the outcome of the jurisdictional hearing.  Several days later, SSA encouraged Father to call City Net, a homeless outreach program, to complete a screening for housing but Father declined to do so because, he claimed, City Net was connected with the police department.

On August 29, 2022, Father's counsel informed the juvenile court that Father had returned to Virginia.  Father was in Virginia at the time of the jurisdictional/dispositional hearing.

In September 2022, Maternal Grandmother's home was approved for placement.  Father approved placing the Children with Maternal Grandmother.  On September 23, 2022, the Children arrived at Maternal Grandmother's home, a four-bedroom house described by SSA as "beautiful and clean" with no visible safety hazards.

In September 2022, E.W. told the assigned social worker she did not want to be placed with Father.  Of concern to E.W. were Father's mental health, inability to support the family due to lack of income and employment, and lack of emotional support. E.W. said that Father had not been employed for 10 years and had not left the house due to "his paranoia."  E.W. would not consider living with Father unless he got a job, obtained safe housing, and addressed his mental health issues.  Z.W. agreed with E.W. and added that Father had not "been there for her" and had not provided basic needs and support in school.  Z.W. wanted to be placed with Maternal Grandmother.  F.W. wanted to be placed with his siblings and was open to being placed with Father, with whom F.W. felt safe.

III.  *Dispositional/Jurisdiction Hearing*

The juvenile court conducted a combined dispositional/jurisdictional hearing on October 11 and 17, 2022.  SSA's detention report, SSA's

9

jurisdiction/disposition report, and the five addendum reports were received into evidence. The only witness to testify was E.W.

A. E.W.'s Testimony

E.W. testified as follows: E.W., her siblings, and Father lived in Virginia for 10 years in the home of Father's girlfriend. E.W. described the home environment as "toxic but stable." By "toxic," E.W. meant it was obvious the girlfriend did not want the Children in her home. Necessities were provided, but the food came from the Electronic Benefits Transfer and clothing from friends, other family, and the girlfriend. While in Virginia, E.W. and her siblings saw doctors and dentists if transportation was available.

E.W. started experiencing depression and anxiety about two years after the family moved into the home of Father's girlfriend. E.W.'s depression and anxiety manifested in thoughts of self-harm and then in self-harming behavior. E.W. did not feel comfortable telling anybody about her mental health issues; as far as she knew, nobody was aware of them. She never saw a counselor or therapist but on her own found an app called "Betterhelp."

Father pulled the Children out of school and left Virginia with no set destination. Father did not contact the school and the Children had not finished their schoolwork for the year. Father first drove the Children to Arkansas, but the resources in that state were not helpful, so he drove them to Texas. In Texas they stayed with Maternal Grandmother, who provided for their needs. While staying with Maternal Grandmother, E.W. felt more stable because she thought the placement was permanent and she would not have to worry about whether she would be in school. Her mental health issues were less severe.

Father and the Children stayed with Maternal Grandmother for two weeks. Father drove the Children to California, where they lived in the car and one night in a cheap motel. That night at the motel, everyone was angry and frustrated because they did

10

not know where they were going and were trying to find housing. Earlier that day, Father had become angry after noticing marks on E.W.'s arm and threatened to have her committed to a mental institution.

Later that night, E.W. and Z.W. went to the car, and when they returned to the motel room, Father became angry and hit E.W. in the face. Father pushed E.W. causing her to fall back against the sink. Father had never hit E.W. before. E.W. was scared because she had never seen Father act that way. E.W. and Z.W. called 911. Father was arrested and the Children were taken into protective custody.

E.W. would not feel safe in Father's care; he would not offer stability and could not provide the Children housing, food, or other necessities. E.W. did not want to tell Father about her mental health struggles because he had said in the past that he believes that people who are suicidal with depression and anxiety are "selfish." E.W. did not tell Father about her eating disorder because she feared how he would react.

Maternal Grandmother was helping E.W. complete her unfinished work from her junior year in high school. Father was not helping E.W. with her schoolwork.

E.W. felt unsafe and during the road trips with Father and suffered emotionally. The Children did not have access to a doctor or dentist and "pretty much were all taking care of ourselves."

E.W. felt stable and safe with Maternal Grandmother and did not want to leave her care. Maternal Grandmother provides the Children a home, food, clothing, stability, and emotional support—including mental health support for E.W.

B. The Juvenile Court's Ruling

The juvenile court found the allegations of the Petition to be true by a preponderance of the evidence and the Children came within section 300, subdivisions (b)(1), (c) and (g). The court declared the Children to be dependent children of the court, removed the Children from Mother's and Father's custody, vested custody with SSA,

11

ordered reunification services for Father, denied reunifications services for Mother (whose whereabouts remained unknown), and approved the case plan recommended by SSA. Father appealed from the jurisdictional/disposition order.

DISCUSSION

I. *Standard of Review*

We review the jurisdictional order to determine whether the findings were supported by substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) "In reviewing the sufficiency of the evidence on appeal, we consider the entire record to determine whether substantial evidence supports the juvenile court's findings. Evidence is "'[s]ubstantial'" if it is reasonable, credible and of solid value. [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) "Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Dependency jurisdiction may be based on any ground set forth in section 300. (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127.) Thus, when a dependency petition alleges more the one statutory ground for asserting dependency court jurisdiction over a minor, the reviewing court can affirm the juvenile court's finding of jurisdiction if any one ground is supported by substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "'In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'"

12

(*Ibid.*)[4]  "As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate."  (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.)

II.  *Substantial Evidence Supports a Finding Under Section 300, Subdivision* (*b*)(*1*)

The first count of the Petition was alleged under section 300, subdivision (b)(1).  This section provides:  "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" the "failure or inability of the child's parent or guardian to adequately supervise or protect the child," or the "willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left," or by the "willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment," or by the "inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."  Substantial evidence supports the allegations that Father failed to protect the Children and failed to provide them with adequate food, clothing, shelter, or medical treatment.

After the Children were taken into protective custody, Father did not take steps to provide for their basic needs.  When he was released from custody, he lived in his car.  He declined to enroll in CalWORKs, declined a housing referral, and declined to contact City Net regarding housing.  Having brought the Children to California, and failing to provide for them here, Father decamped to Virginia.  At the time of the jurisdictional hearing, Father was not providing the Children shelter, food, or medical

---

[4]  We have discretion to reach the merits of any other jurisdictional finding if the finding serves as a basis for a dispositional order also being challenged on appeal. (*In re J.N.* (2021) 62 Cal.App.5th 767, 774.)  In the present case, Father does not challenge any of the dispositional orders.

13

care. E.W. testified she would not feel safe in Father's care, Father did not offer stability and could not provide E.W. and her siblings housing, food, or other necessities.

The question under section 300 is whether circumstances at the time of the hearing subjected the minor to the identified risk of harm. (*In re T.V., supra*, 217 Cal.App.4th at p. 133.) In making that determination, the court may consider past events as "[a] parent's past conduct is a good predictor of future behavior." (*Ibid*.) "'Facts supporting allegations that a child is one described by section 300 are cumulative.'" (*Ibid*.) The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re I.J., supra*, 56 Cal.4th at p. 773; *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383; *In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

The evidence before the juvenile court established that Father failed to protect the Children, never provided them with adequate food and shelter, and sometimes did not provide them medical treatment.

With respect to the allegation of failure to protect, it was not necessary for SSA to prove that Father engaged in conduct amounting to neglect. A finding that a parent is at fault or blameworthy for the parent's inability to supervise or protect the child is unnecessary to establish dependency court jurisdiction based on the failure or inability of his or her parent or guardian to adequately supervise or protect the child. (*In re R.T., supra*, 3 Cal.5th at p. 624.)

Substantial evidence supports a finding that Father's failure to provide the Children with adequate shelter and food was the result of either Father's willfulness or negligence. The Children's condition did not just come about by happenstance. Father made a series of intentional, conscious decisions—from relying on his girlfriend for shelter, to not leaving the girlfriend's home and obtaining employment, to leaving Virginia with no plan in place, to refusing to let the Children stay with Maternal Grandmother, to relying on handouts, to pushing and hitting E.W. in the motel room, to

14

declining services offered by SSA, to returning to Virginia—that caused the Children to lack adequate shelter and food, and often medical care, and demonstrated his inability to provide for their regular care. Substantial evidence supported a finding that Father's failure to provide E.W. adequate mental health care was due to at least neglect, in particular his lack of involvement in her well-being.

Father acknowledges that at the time of the jurisdictional/dispositional hearing he did not have the resources to care for the Children. He argues, however that he did provide the Children with adequate shelter, food, and medical care because he approved their placement with Maternal Grandmother, with whom the Children were living at the time of the hearing.[5] Maternal Grandmother, not Father, is providing shelter, food, and medical care for the Children. Father did not provide or arrange placement with Maternal Grandmother — SSA and the juvenile court did. Placement with Maternal Grandmother, and Father's approval of the placement, came about only because the Children were taken into protective custody, ordered to be detained, and removed from Father's custody.

Father's argument that he provided for the Children by approving the placement with Maternal Grandmother leads to an illogical result. Under Father's reading of section 300, subdivision (b)(1), a parent who has failed to provide for a child's basic needs could defeat dependency court jurisdiction by the mere act of approving placement of a detained child with a caregiver who does provide those needs. But without dependency court jurisdiction, custody of the child would have to be returned to the parent who had not provided for the child's needs. Here, Father agreed to placement of the Children with Maternal Grandmother only in the face of an ongoing dependency proceeding. Father's prior actions in removing the Children from Maternal

---

[5] It is unclear whether Father is making this argument with respect to the findings under sections 300, subdivisions (b)(1) and (g) or only the findings under section 300, subdivision (g).

15

Grandmother's home indicates he would do precisely the same thing if the juvenile court did not exercise dependency jurisdiction.

## DISPOSITION

The order is affirmed.

SANCHEZ, J.

WE CONCUR:

O'LEARY, P. J.

BEDSWORTH, J.