Filed 12/1/23  In re Larry C. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re LARRY C. et al., Persons Coming Under the Juvenile Court Law. | B324556 (Los Angeles County Super. Ct. No. 21LJJP00363A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>T.C.,<br><br>        Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County, Susan Ser, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

Defendant and appellant T.C. (mother) appeals from the juvenile court's findings and orders establishing dependency jurisdiction over her children Larry C. (Larry, born 2006), Laraya C. (Laraya, born 2009), and Laraina C. (Laraina, born 2011)[1] pursuant to Welfare and Institutions Code section 300.[2] We affirm.

## BACKGROUND

I. *Referral and Initial Investigation*

On July 11, 2021, the Los Angeles County Department of Children and Family Services (DCFS) received a referral from the Los Angeles County Sheriff's Department (LASD) following the death of one-year-old T.B. Although he was not related to mother or minors, T.B. had been left in mother's care and died in her home.[3]

---

[1] We refer to Larry, Laraya, and Laraina, collectively, as minors.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] T.B.'s mother told a DCFS social worker that minors' mother was a "lifelong friend" of hers. T.B.'s mother had left T.B. and his older sibling in minors' mother's care about two months earlier because she was homeless and did not want her children

2

DCFS's subsequent investigation following the referral involved four extended families because numerous children, in addition to minors and T.B., were living in mother's home at the time of T.B.'s death. The following subsections summarize pertinent facts disclosed during interviews conducted by either a DCFS social worker or LASD detectives.

A. Mother

Mother reported that, on July 10, 2021, she took the numerous children in her care to a water park. They returned to the family home at around 7:00 p.m. Mother and Laraya then left for a local skate park to sell food. Mother returned home at around 10:00 p.m., but Laraya spent the night with her "boss" because she was going to work again the next day.

Mother left the home again and did not return until about 3:00 a.m. the next morning, leaving the children in the care of adults J.P. and Alicia R. (Alicia). Upon her return, mother "went straight to her room and went to sleep" without checking on any of the children. Mother initially would not disclose her whereabouts during the night and "simply stated, 'I'm grown.'" She "eventually reported that she had been out drinking."

At around 10:00 a.m. on July 11, 2021, Laraina came into mother's room and told her that something was wrong with T.B. Mother asked Laraina to bring T.B. to her. When mother grabbed T.B. from Laraina, he was limp and unresponsive. Mother called 911, and Alicia tried to perform CPR. According to mother, Laraina initially reported that she had seen another child's legs on top of T.B. but later said that she was not sure.

"bouncing around with her." T.B. did not have a permanent sleeping arrangement in the home and "would sleep with whoever he wanted to sleep with."

3

Mother disclosed that she drank a "'personal bottle' ($20) of Hennessy" and three tall cans of Bud Light on a daily basis. Mother asked to leave the hospital during her interview with the DCFS social worker because she needed to buy an alcoholic beverage. Mother denied using drugs, but admitted that she allowed J.P. and Alicia to smoke marijuana in mother's bedroom as long as the door was closed. J.P. and Alicia smoked marijuana twice a day and also smoked outside of the home.

B. Alicia

Alicia was one of the adults who mother had reported was caring for the children while mother was out drinking on the night of July 10, 2021, into the early morning hours of July 11, 2021. Alicia, however, reported that she had left the home at around 10:00 to 11:00 p.m. and did not return until about 2:00 to 2:30 a.m. Upon her return, she slept on the couch with a child and reported seeing several children sleeping on the floor.

On the morning of July 11, 2021, Laraina told mother, Alicia, and J.P. that she needed to tell them something. Laraina went on to state that another child had her legs on T.B. and that T.B. "was breathing." Laraina brought a limp T.B. to mother. Alicia said they called 911 and, per instructions, she attempted to perform CPR. T.B. did not respond.

C. Larry

Fifteen-year-old Larry said that he and the other children watched a movie the previous night, ate popcorn, and went to sleep. He recalled that J.P., who was ill and throwing up all night, put T.B. to sleep on two separate occasions. T.B. was finally put to bed in one of the rear bedrooms where several children slept. J.P. was the only adult in the home. Larry went to sleep on the living room couch.

4

Regarding mother's drinking, Larry stated, "'When she's drunk, she has someone take up to practice.'" He explained that mother used to "'drink back to back to back, but not anymore'" and that she currently drank about two times per week.

The social worker noted that it appeared Larry had some developmental delays and exhibited behaviors much younger than his chronological age. He had several bug bites on his arms and legs. He emitted a foul body odor, and it appeared that it had been several days since his last shower. He wore extremely soiled clothing.

D. <u>Laraina</u>

Ten-year-old Laraina said she, T.B., and three other children were sleeping on two mattresses pushed together. Laraina initially said that when she woke up, she saw that T.B. was on the lower end of the bed, close to her and another child's feet. She reported—but later denied—that she saw someone's feet wrapped around T.B.

Mother told Laraina to wake T.B. up and get him ready for the day. When she went to wake him, she saw that T.B. was not breathing. Laraina got scared and went into the bathroom to cry because she did not know what to do. She stayed in the bathroom "for a while" and then told mother that T.B. was not breathing. Mother instructed Laraina to bring T.B. to her. Laraina complied and felt that T.B.'s body was limp.

Laraina was visibly upset and crying during the interview. She stated that she did not want mother to go to jail. Although she eventually stopped crying, Laraina resumed crying when asked about mother's alcohol use. She stated that she did not want to be taken from mother. She admitted that mother drank alcohol but not when Laraina and her siblings were around.

According to Laraina, mother was sad because her girlfriend had been killed.

The social worker noted that Laraina could have a slight developmental delay and, at times, displayed behaviors younger than her chronological age. Laraina had several bug bites on her body, emitted a foul body odor, and appeared to have not showered for several days. Her clothes were soiled.

E. <u>Laraya</u>

Eleven-year-old Laraya stated that she had spent the night at "'the hot dog lady's' house" and was not home when T.B. was found not breathing. Laraya began crying when asked about mother's alcohol use, stating that they would be taken from mother. She disclosed that mother drank every day, usually in the home while the children were in their rooms. She also reported that "the adults smoke 'weed' in the room while the children are in the living room or vice versa."

The social worker noted that Laraya also appeared to have a slight developmental delay, displaying behaviors younger than her chronological age and having several tantrums during her interview. Of the three minors, Laraya was the only one who did not have a foul body odor and was wearing clean and appropriate clothing.

F. <u>Coroner investigator</u>

Although T.B.'s autopsy was pending, the coroner investigator stated that it was "believed by all parties that the child might have been smothered by the other children that were co-sleeping in the bed with him."

II. *Dependency Petition*

On July 13, 2021, DCFS filed a dependency petition seeking the juvenile court's exercise of jurisdiction over minors

pursuant to section 300, subdivision (b)(1) (failure to protect). Count b-1 alleged that mother was "a current abuser of marijuana and a daily current abuser of alcohol[,]" which rendered her incapable of providing minors with regular care and supervision. Count b-2 alleged that mother had placed minors "in a detrimental and endangering home environment" by permitting J.P. and Alicia, who mother knew were marijuana abusers, to reside in minors' home, provide care to minors, and abuse marijuana in minors' home and in minors' presence.

III. *Detention*

The detention hearing took place on July 16 and 19, 2021. The juvenile court found that a prima facie showing had been made that minors were persons described by section 300 and detained them from parental custody.[4] Minors were placed in shelter care under DCFS supervision.

IV. *Jurisdiction/Disposition Report (August 2021)*

DCFS reported that mother was enrolled in an outpatient program, where she participated in parenting education and individual counseling and attended AA meetings. When a dependency investigator visited mother's home, she did not observe any proper sleeping arrangements for minors. Each minor appeared to have developmental delays. Each had been diagnosed with ADHD and was prescribed psychotropic medication. Laraya had been hospitalized in a psychiatric hospital during the reporting period. Mother had daily telephonic communication with minors and monitored visitation once per week.

---

[4] The whereabouts of minors' father were unknown throughout these proceedings. He is not a party to this appeal.

7

When interviewed on August 6, 2021, mother stated that she used to drink often but had stopped. She denied smoking. She was enrolled in an outpatient program, which she thought she needed and was learning a lot from. When she craved alcohol, she went to bingo. Mother attributed her drinking to her brother murdering her girlfriend.

Regarding J.P. and Alicia's marijuana use, mother stated, "'I did let them both smoke outside the house; however, no one is no longer able to smoke in my house. I should've been here on the day of the incident and making sure no one was smoking marijuana in my house. I'm learning in the outpatient program that there should be at least one sober parent in the house.'"

## V. *Last Minute Information for the Court*

In early September 2021, DCFS reported that mother had enrolled in an intensive outpatient substance abuse program on July 20, 2021, and had a projected completion date of January 19, 2022. Mother drug tested negative six times from July 15, 2021, through September 2, 2021. Her July 13, 2021, drug test leaked in transit. An August 18, 2021, test returned positive for alcohol at 0.10 percent. Mother attributed the positive alcohol test to drinking Nyquil. The social worker contacted the laboratory and was told that Nyquil could cause a positive result.

## VI. *Adjudication Hearing*

After entertaining oral argument on September 10, 2021, the juvenile court sustained count b-1, as amended by interlineation to strike references to marijuana abuse, and count b-2 as pled.

The juvenile court commended mother for getting treatment and noted that it "appear[ed] that mother [was] being very honest with herself about the issues." As to count b-1, the

8

court stated: "Mother admitted that . . . she does have an alcohol issue, which she is addressing. And the children state that they have seen mother daily consume alcohol. You know, there are many parents who do drink alcohol, but my belief is that daily consumption of alcohol . . . does affect decisionmaking, which [a]ffects the safety of the children. [¶] And in looking at the prior history, and the decision of the mother to leave the children that one night which led to the incident of the death of the nonrelated child, I believe there is a current risk to the children connected to mother's alcohol use."

The juvenile court declared minors dependents of the court and removed them from mother's custody. The court ordered DCFS to provide mother with family reunification services. Mother was granted unmonitored telephone and video visits and monitored in-person visits with DCFS having the discretion to liberalize.

VII. *Appeal*

Mother filed a timely notice of appeal from the September 10, 2021, jurisdictional findings and dispositional orders.

VIII. *Subsequent Events*[5]

On March 10, 2022, the juvenile court terminated its suitable placement order and ordered minors returned to mother's home with DCFS providing family maintenance services.

## DISCUSSION

On appeal, mother contends that insufficient evidence supports the juvenile court's jurisdictional findings.[6]

---

[5] On June 30, 2023, DCFS filed a motion requesting that we take judicial notice of the juvenile court's March 10, 2023, minute orders regarding minors. We hereby grant the unopposed motion. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); *In re M.F.* (2022) 74 Cal.App.5th 86, 110 ["While appellate courts rarely consider postjudgment evidence or evidence developed after the ruling challenged on appeal, such evidence is admissible for the limited purpose of determining whether the subsequent development has rendered an appeal partially or entirely moot"].)

[6] Although mother's notice of appeal also referred to the dispositional orders removing minors from her custody, mother's appellate briefs do not challenge those orders. She has thus forfeited any claim of error regarding the removal orders. (See *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived"].) In any event, the subsequent return of minors to mother rendered moot an appellate challenge to the removal orders because we can longer provide her with any effective relief. (See *In re N.S.* (2016) 245 Cal.App.4th 53, 60 ["the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error"].)

10

I. *Relevant Law*

Under section 300, subdivision (b)(1), the juvenile court has jurisdiction over and may adjudge to be a dependent of the court a "child [who] has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of"— as relevant here—"[t]he failure or inability of the child's parent . . . to adequately supervise or protect the child" (§ 300, subd. (b)(1)(A)) or "[t]he inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse" (§ 300, subd. (b)(1)(D)).

"While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the child to the defined risk of harm." (*In re Emily L.* (2021) 73 Cal.App.5th 1, 15.) Still, "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivision[] at issue here require[s] only a 'substantial risk' that the child will be abused or neglected. . . . [Citation.] 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

II. *Standard of Review*

Jurisdictional findings must be made by a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) We review those findings for substantial evidence—"evidence that is reasonable, credible and of solid value. [Citations.] We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all

11

reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

III. *Analysis*

Substantial evidence supports the count b-1 jurisdictional finding that mother's alcohol abuse interfered with her ability to provide regular care for minors, thus creating a substantial risk that minors would suffer serious physical harm.[7] (§ 300, subd. (b)(1).)

When she was interviewed following T.B.'s death, mother admitted that she drank a "'personal bottle' ($20) of Hennessy" and three tall cans of Bud Light every day. She was unable to get through her interview with a DCFS social worker because she could not control her compulsion to purchase more alcohol to consume. She drank every day even though she had several children, in addition to minors, under her care.

The juvenile court could infer that mother's alcohol abuse had deleterious effects on minors, as there were numerous examples of her neglect. Two of the three minors emitted a foul

---

[7] Because the sustained count b-1 allegations against mother bring minors within the juvenile court's jurisdiction under section 300, subdivision (b)(1), we do not address whether substantial evidence also supports the count b-2 allegations regarding marijuana abuse by J.P. and Alicia. (See *In re D.P.* (2023) 14 Cal.5th 266, 284 ["where there are multiple findings against one parent; the validity of one finding may render moot the parent's attempt to challenge the others"]; *In re Ashley B.* (2011) 202 Cal.App.4th 968, 979 ["As long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate"].)

odor, wore soiled clothing, and lacked proper hygiene. On the night of T.B.'s death, mother went out to drink, leaving minors and the other children under her care with adults who regularly used marijuana in the home. One of the adults, Alicia, also left the home and did not return until after the children were asleep. The other adult, J.P., was vomiting all night. Upon her return home, mother failed to check on any of the children. Mother's neglect led to Laraya sharing an unsafe sleeping environment with T.B. and enduring the trauma of discovering him not breathing.

Commendably, mother acknowledged her drinking problem and sought treatment following T.B.'s death. But the adjudication hearing took place only two months later. Contrary to mother's arguments on appeal, the juvenile court could reasonably conclude that her recent efforts at sobriety did not ameliorate the continued substantial risk of harm to minors. (See *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423–424 [200 days of sobriety insufficient to reassure the juvenile court that a relapse would not occur]; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"].) The court was not required to believe mother's claim that the August 18, 2021, test that returned positive for alcohol was caused by taking Nyquil and, instead, could infer that mother had consumed alcoholic beverages. (See *Gross v. Needham* (1960) 184 Cal.App.2d 446, 460 [in applying the substantial evidence standard of review, an appellate court "must also assume in favor of the determination below the existence of every fact which the trier of facts could have reasonably deduced from the evidence"].)

Mother cites *In re Natalie A.* (2015) 243 Cal.App.4th 178, 185 (*Natalie A.*), for the proposition that "[t]o warrant juvenile court jurisdiction . . . [a parent's] level of substance abuse must manifest as (1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home; (2) recurrent use in situations in which it is physically hazardous; (3) recurrent substance-related legal problems; *and* (4) continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance."  (Italics added.)

Mother misreads *Natalie A.*, which does not hold that each of these conditions must be satisfied before a juvenile court can exercise dependency jurisdiction based on a parent's substance abuse.  (See *Natalie A.*, *supra*, 243 Cal.App.4th at pp. 185–186.) Rather, in that case, the Court of Appeal found substantial evidence that a parent was a substance abuser where the evidence indicated the presence of "one of the most salient manifestations of parental substance abuse":  "'"a failure to fulfill major role obligations at . . . home (e.g., . . . neglect of children or household) . . . ."'  [Citation.]"  (*Id.* at p. 185.)  As discussed above, evidence of that same type of neglect exists here.

**DISPOSITION**

The findings and orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, Acting P. J.
ASHMANN-GERST

We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT